[No. A071368. First Dist., Div. Two. Oct. 30, 1996.]

GEORGINA CHENG-CANINDIN, Plaintiff and Respondent, v. RENAISSANCE HOTEL ASSOCIATES et al., Defendants and Appellants.

COUNSEL

Ballard, Rosenberg & Golper, Kenneth R. Ballard and Sherrie Lipsky Sheldon for Defendants and Appellants.

Robert H. Blumenthal, McGuinn, Hillsman and Palefsky and Cliff Palefsky for Plaintiff and Respondent.

OPINION

HAERLE, J.—

## I. INTRODUCTION

Respondent Georgina Cheng-Canindin brought a wrongful termination suit against the owners and management of her former employer, the Parc Fifty Five Hotel (the Hotel). Appellants Renaissance Hotel Associates and Lawrence Chan are two of the defendants in the wrongful termination action who petitioned the trial court to compel respondent to participate in "mandatory contractual arbitration" of her claims. Appellants contend the trial court erred by denying their petition and refusing to compel respondent to submit her dispute to the Hotel's "Review Committee" for a final and binding resolution of her claims. We hold that respondent did not agree to arbitrate her claims against the Hotel and therefore affirm the trial court's order denying the petition to compel arbitration.

## II. STATEMENT OF FACTS

### A. *Respondent's Employment by the Hotel*

Respondent was hired by the Hotel on January 30, 1985, and was employed in its human resources department. In February 1987, she signed a document entitled "Receipt of Employee Handbook." That document states, in part: "I have this day received a copy of the Renaissance Employee

Handbook. I agree to fully and completely read the Employee Handbook and to abide by the rules and regulations contained therein. I agree to resolve all disputes concerning my employment with the Hotel by the procedures outlined in this Handbook."

## B. *The Hotel's "Internal Problem Solving Procedure"*

### 1. *The Employee Handbook*

The Renaissance Employee Handbook (the Handbook) contains a section entitled "Internal Problem Solving Procedure." The stated purpose of this procedure is that "[t]he Hotel realizes that occasionally employees may have comments, questions or complaints concerning working conditions, policies or misunderstandings with other employees or with management. To help solve any concerns you may encounter, we encourage you to talk with your supervisor. We will protect your rights to discuss any job problems without fear of reprisal. Problems relating to our personnel policies and procedures can and should be settled as soon as they arise. [¶] To provide our employees with prompt and fair consideration of unresolved concerns, the Hotel has adopted an Internal Problem Solving Procedure. This procedure is an integral part of our open communication policy, and we encourage you to use it whenever appropriate."

The Handbook outlines the Hotel's "four-step" internal problem-solving procedure. Step No. 1 instructs the employee to bring all problems to his or her immediate department head unless the complaint concerns that person. Step No. 2 is to advise the employee's division head of the problem. If the problem is not solved, step No. 3 is to contact the personnel manager. If the employee is "still not satisfied with the outcome" he or she is instructed to go to step No. 4, which is described as follows:

"You may bring your problem or concern to the Renaissance Review Committee. We hope that most disagreements or problems you have concerning your employment with the Renaissance can be satisfactorily resolved by the three steps listed above. However, we realize that some disputes are better handled by an impartial group of individuals with no 'stake' in the outcome. Therefore, the Renaissance Review Committee has been developed to be the final decision-maker in all disputes arising out of your employment with the Hotel. The Renaissance Review Committee is made up of employees and members of management, all from outside of your department. After all facts are presented to the Committee, it will discuss the dispute and reach

a binding decision based on a majority vote by the members of the Committee. The decision of the Committee will be final for all parties involved."[1]

## 2. *The Employee Guide*

According to the Hotel, it made available to employees an "Employee Guide" (the Guide) which sets forth rules and procedures applicable to the review committee. The Guide indicates that the scope of the committee's authority is unclear. Although the committee's authority is characterized as "final and binding" and expressly extends to "[a]ll challenged terminations of employment," the committee does not have authority to hear disputes that the general manager deems to be "outside the Committee's jurisdiction." Nor does the committee have authority to review performance evaluations, alter Hotel policy or procedure, set rates of pay or benefits or "rule upon minor disputes or grievances whose disposition may be better decided at a later date . . . ." The Guide also instructs that "[n]either party may challenge the existence or wisdom of Hotel policies, rules or procedures."

The review committee consists of two employees, two members of management and the general manager of the Hotel. The general manger votes as to how to resolve a dispute only in the case of a tie. In addition, there is a "Procedural Chairperson from Personnel, who shall render the final decision on what evidence is relevant" and who, according to the Guide "shall also disallow all testimony which is unnecessarily derogatory and personal in nature."

The Guide provides employees with advice about preparing for the review by, for example, strongly discouraging using an attorney. On this subject, the Guide states: "We believe this process should be kept as informal as possible. Therefore, neither the Hotel or the employee bringing the dispute should be represented by an attorney or other outside individual before the Committee. However, if you believe you cannot adequately state your position without assistance, you may designate someone from the Personnel Department to assist you in preparing or presenting your case. If you insist on being represented by an attorney, you may bring one with you to the Review, at your expense, provided written notice is given to the Hotel . . . ."

The Guide provides that employees may call other employees to present information to the committee but imposes significant limits on this right.

---

[1] The Hotel was known as the San Francisco Ramada Renaissance Hotel until May 1989 when its name was changed to the Parc Fifty Five Hotel. When the Hotel's name was changed, so was the name of the review committee. However, the format, rules and procedures pertaining to the review committee remained the same.

First, the personnel department must determine whether the employees "may be relieved of duty during the time they are scheduled to meet with the Committee."[2] Second, the general manager makes the "final decision" regarding the necessity of the appearance of a witness who does not wish to appear. And third, "attendance by all such employees will be voluntary."

### 3. *The Sourcebook for Members*

Employees who volunteer to participate as committee members are given a copy of the "Review Committee Sourcebook for members" (the Sourcebook). The Sourcebook tells prospective committee members that "[t]he purpose of the Committee is to ensure that major decisions affecting the employment of individual employees is [*sic*] made in accordance with Hotel policy." The Sourcebook further advises that "the Committee may not change, alter or modify existing Hotel policies, as this responsibility must remain with the General Manager or Executive Committee."

According to the Sourcebook, "[t]he members of the Committee for a particular session will be chosen at random from a pool of volunteers. The Personnel Department is responsible for administering the selection process." The members are chosen one week before the scheduled meeting to hear the dispute. Before any testimony is heard, the procedural chairperson provides the committee with a summary of the employee's personnel file and copies of relevant Hotel rules and regulations.

The Sourcebook instructs volunteers that "[a]fter having heard all the evidence presented to you by both sides, you will vote on the basis of *whether or not Hotel policies were followed*." First among the "standards" that prospective members are instructed to apply to their decisionmaking process is that "Hotel policies will govern all actions. The Committee is not authorized *to make exceptions to Hotel policies* or *interpret the policies differently* for any one individual, unless such an exception has been authorized in writing by the General Manager."

### C. *The Present Action*

On March 10, 1994, respondent, who was five months pregnant, was terminated from her employment. Respondent filed a wrongful termination complaint alleging, among other things, sex and race discrimination, violations of public policy and defamation. Instead of answering the complaint,

---

[2]The Guide provides that "[i]t is possible that employees who are unable to meet with the Committee may be requested to put their statement in writing and this statement will be considered by the Committee."

respondents filed a "petition to compel plaintiff's compliance with contractual alternative dispute resolution, including arbitration pursuant to California Code of Civil Procedure § 1281.2" (the petition).

In their petition, appellants alleged that respondent was terminated for breaching company policy concerning confidentiality of personnel information. The petition further alleged that respondent refused to resolve her dispute concerning the basis for her termination by participating in the mandatory internal problem solving procedures which she had previously agreed to follow. The petition requested that the trial court stay court proceedings pending completion of "arbitration in the form of the Parc Fifty Five Review Committee procedures."

At the hearing on their petition, appellants argued that respondent, by agreeing to comply with the terms of the Handbook, did not simply agree to participate in the review committee procedure before filing suit, but that she effectively waived her right to a judicial forum with respect to any claim relating to her employment. Appellants also challenged any notion that the review committee procedure was "inherently biased." According to appellants, federal law preempts state law regarding the enforceability of this agreement and federal law requires proof of actual bias. After the hearing, the trial court issued a minute order denying appellants' petition to compel arbitration on two primary grounds.

First, the trial court ruled the agreement was unconscionable under the standards set forth in *Graham* v. *Scissor-Tail, Inc.* (1981) 28 Cal.3d 807 [171 Cal.Rptr. 604, 623 P.2d 165] (*Graham*). The court reasoned the agreement did not meet the requisite level of "minimum integrity" articulated by the Supreme Court in *Graham* because the agreement was "inherently biased in design and thus unconscionable and unenforceable." The court found the agreement was inherently biased because it provided for a "non-neutral" arbitration panel by naming coworkers as final arbitrators to employment disputes. In response to appellants' argument that state law prohibiting the use of non-neutral panels was preempted by conflicting federal law, the trial court ruled that the agreement at issue in this case was outside the jurisdiction of the Federal Arbitration Act. (9 U.S.C. § 1 et seq.)

Second, relying on *Prudential Ins. Co. of America* v. *Lai* (9th Cir. 1994) 42 F.3d 1299, the trial court held that the agreement did not fully protect respondent's title VII rights and remedies (42 U.S.C. § 2000e et seq.). Noting that state antidiscrimination laws are explicitly made part of title VII's enforcement scheme, the court found no evidence respondent "knowingly waived the rights and remedies created by Title VII."

### III. Discussion

Appellants contend the trial court erroneously concluded that the agreement at issue in this case is not governed by the Federal Arbitration Act (the FAA), that the FAA mandates that an arbitration agreement be enforced absent proof of actual bias, and that there is no evidence of actual bias in this case. ▮ We find it unnecessary to address these contentions because we conclude that the parties to this appeal did not enter into an arbitration agreement at all.[3]

▮ Under both federal and state law, the threshold question presented by a petition to compel arbitration is whether there is an agreement to arbitrate. The United States Supreme Court has stated that ". . . the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." (*Mitsubishi Motors* v. *Soler Chrysler-Plymouth* (1985) 473 U.S. 614, 626 [87 L.Ed.2d 444, 454, 105 S.Ct. 3346].) Similarly, under California law, " '[a]rbitration is recognized as a matter of contract, and a party cannot be forced to arbitrate something in the absence of an agreement to do so.' " (*Chan* v. *Drexel Burnham Lambert, Inc., supra,* 178 Cal.App.3d at p. 640; see also *Delta Dental Plan* v. *Banasky* (1994) 27 Cal.App.4th 1598 [33 Cal.Rptr.2d 381]; *Spellman* v. *Securities, Annuities & Ins. Services, Inc.* (1992) 8 Cal.App.4th 452, 457 [10 Cal.Rptr.2d 427].)

The question of whether the parties agreed to arbitrate is answered by applying state contract law even when it is alleged that the agreement is covered by the FAA. (See *Chan* v. *Drexel Burnham Lambert, Inc., supra,* 178 Cal.App. 3d at p. 640; *Wasyl, Inc.* v. *First Boston Corp.* (9th Cir. 1987) 813 F.2d 1579, 1582; *Progressive Cas.* v. *C.A. Reaseguradora Nacional* (2d Cir. 1993) 991 F.2d 42, 45-46; *Ziegler* v. *Whale Securities, Co., L.P.* (N.D.Ind. 1992) 786 F.Supp. 739, 741-742; *Cook Chocolate Co.* v. *Salomon, Inc.* (S.D.N.Y. 1988) 684 F.Supp. 1177, 1182.)

In the present case, neither the alleged agreement nor any of the literature describing the Hotel's review committee procedure employs the term arbitration. "[T]he failure of the agreement to identify the grievance procedure as 'arbitration' is not fatal to its use as a binding mechanism for resolving

---

[3]Although we base our holding on a ground that was not articulated by the trial court, we note that appellant does argue to this court that the Hotel's review committee procedure constitutes a valid arbitration procedure. Further, it is well settled that the ruling of a trial court should be affirmed if " ' "right upon any theory of the law applicable to the case . . . ." ' " (*Chan* v. *Drexel Burnham Lambert, Inc.* (1986) 178 Cal.App.3d 632, 645, fn. 6 [223 Cal.Rptr. 838], quoting *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10].)

disputes between the parties. [Citations.] [¶] More important is the nature and intended effect of the proceeding." (*Painters Dist. Council No. 33* v. *Moen* (1982) 128 Cal.App.3d 1032, 1036 [181 Cal.Rptr. 17] (*Painters*).)
 Here, the nature and intended effect of the review committee procedure compel the conclusions that the parties did not in fact enter into an arbitration agreement nor did they even intend to do so.

## A. *The Nature of the Review Committee Procedure Does Not Evince an Agreement to Arbitrate*

Appellants contend the review committee procedure constitutes arbitration. Our review of the relevant authorities defining arbitration leads us to a decidedly contrary conclusion. Indeed, the nature of the review committee procedure is inconsistent with the concept of arbitration.

### 1. *"Arbitration" Defined*

California statutory law pertaining to the validity and enforceability of arbitration agreements does not define "arbitration." (Code Civ. Proc., § 1280 et seq.) The only California case we have found which purports to do so is *Stockwell* v. *Equitable F.& M. Ins. Co.* (1933) 134 Cal.App. 534 [25 P.2d 873] (*Stockwell*), which states that arbitration is "the submission for determination of a disputed matter to private unofficial persons selected in the manner provided by law or by agreement of the parties."[4] (134 Cal.App. at p. 540.) The *Stockwell* court's definition offers little guidance as to the requisite attributes of a true arbitration agreement.

 The most useful definition of arbitration we have found is contained in Black's Law Dictionary which defines arbitration as: "A process of dispute resolution in which a neutral third party (arbitrator) renders a decision after a hearing at which both parties have an opportunity to be heard. Where arbitration is voluntary, the disputing parties select the arbitrator who has the power to render a binding decision." (Black's Law Dictionary (6th ed. 1990) p. 105, col. 1.) We glean from this definition several attributes of a true arbitration agreement: (1) a third party decision maker; (2) a mechanism for ensuring neutrality with respect to the rendering of the decision; (3) a decision maker who is chosen by the parties; (4) an opportunity for both parties to be heard, and (5) a binding decision. Although we have not found a California case which adopts Black's definition,

---

[4]This definition was repeated in a more recent California decision which is otherwise not relevant to the issues we address here. (See *Howard* v. *Drapkin* (1990) 222 Cal.App.3d 843, 854, fn. 5 [271 Cal.Rptr. 893].)

we have found that the procedures which are characterized by California courts as "arbitrations" possess the attributes set forth in Black's definition.

In *Stockwell* an insurance company appealed from a jury determination as to the amount of loss suffered by an insured as a result of fire. (*Stockwell, supra,* 134 Cal.App. 534.) It argued that a previous appraisal of the property, which was made pursuant to the terms of the insurance contract, was binding on the insured and rendered the jury determination void and ineffectual. The appraisal procedure outlined in the *Stockwell* contract provided that each party was to select a " 'disinterested appraiser' " and that the two appraisers would select a " 'competent and disinterested umpire.' " (*Id.* at p. 537.) The appraisers were to jointly determine the amount of loss and to submit their differences to the umpire. (*Ibid.*) The *Stockwell* court characterized this appraisal procedure as an arbitration agreement although it did not enforce the appraisers' decision because of fraud. (*Id.* at p. 539.)

California law now requires that a standard appraisal provision be included in California fire insurance contracts. (Ins. Code, § 2071.) And California case law recognizes that this appraisal provision is an arbitration agreement. (*Appalachian Insurance Co.* v. *Rivcom Corp.* (1982) 130 Cal.App.3d 818 [182 Cal.Rptr. 11].) Much like the *Stockwell* agreement, the standard appraisal provision states that, in the event the parties disagree as to the amount of loss suffered by the insured, either party may compel an appraisal. In such an event, each party selects its own "competent and disinterested" appraiser and, together the appraisers select a "competent and disinterested umpire" to resolve disagreements between the appraisers. (Ins. Code, § 2071.)

Appraisal provisions such as the one contained in *Stockwell* and the standard provision contained in modern fire insurance policies contain the attributes of the Black's Law Dictionary definition of arbitration. Both parties participate in the selection of the third party decision makers and have the opportunity to be heard on the disputed issue. And, to the extent that the party affiliation of the appraisers may preclude agreement, an impartial resolution is achieved by virtue of the third party umpire.

Other contractual dispute resolution procedures which have been characterized by California courts as arbitration agreements also contain the attributes set forth in the Black's definition of arbitration. For example, in *Silva* v. *Mercier* (1949) 33 Cal.2d 704, 708 [204 P.2d 609] (*Silva*), our Supreme Court was asked to determine whether a collective bargaining agreement had expired pursuant to one of its provisions. (*Id.* at p. 707.) The

court declined to address this issue because another provision in the agreement provided that disputes as to how to interpret provisions of the agreement were to be resolved by a trade board composed of three representatives of each contracting party. (*Id.* at p. 708.) The agreement further provided that decisions of the board "'*shall be final* and shall be enforced by the parties hereto.'" In the event a majority of the board failed to agree, the dispute was to be settled first by a mediator and then by an arbitrator. (*Ibid.*) The *Silva* court found that the trade board had already determined the contract had not expired and refused to revisit the issue, stating: "When an agreement provides for the determination by a third person or persons of some proper matter to be settled and that the decision shall be final, a submission to and determination by him or them of the matter is binding on the parties. That is true whether the arrangement is technically a common law or statutory arbitration or something akin thereto." (*Ibid.*)

Although the contract provision discussed in *Silva* was not labeled as an arbitration agreement, its attributes make it easily identifiable as one. Both parties participated in the selection of the decision makers. Although board members were "representatives" of the parties, the procedure also called for appointment of a mediator and an arbitrator. Thus, the *Silva* procedure allowed party participation through board representatives while also ensuring that disagreements among board members would be settled by a neutral third party. Further, the arbitration agreement was part of a voluntary and negotiated collective bargaining agreement; i.e., there was no question the parties voluntarily agreed to have their dispute finally resolved by a procedure other than a court action.

Another California decision relevant to our analysis is *Parker* v. *Twentieth Century-Fox Film Corp.* (1981) 118 Cal.App.3d 895 [173 Cal.Rptr. 639] (*Parker*). In *Parker*, the parties to a joint venture included in their agreement a provision that any controversy relating to the distribution of proceeds from their joint venture would be submitted to Los Angeles certified public accountants acceptable to both parties or, if the parties could not agree, to an accountant appointed by the American Arbitration Association. The agreement further provided that the decision of the accountants would be final and conclusive as to the parties. The *Parker* court found that the contract provision was an arbitration agreement, although the parties had agreed to arbitrate only a single narrow issue.

Like the other agreements we have discussed, the accounting provision in the *Parker* agreement is readily identifiable by its attributes as an arbitration agreement. The parties' dispute was to be submitted to a third party, chosen

by both parties, for a final decision and, in the event the parties could not agree on an accountant, a neutral third party would be responsible for selecting an accountant to resolve the dispute.

All of this authority confirms our strong view that a third party decision maker and some decree of impartiality must exist for a dispute resolution mechanism to constitute arbitration. This conclusion is reinforced by authority from several other states which define the arbitration process as requiring an impartial third party decision maker with authority to render a final and binding decision. (See *Gary Excavating, Inc.* v. *Town of North Haven* (1972) 164 Conn. 119 [318 A.2d 84, 85] [" 'the voluntary submission . . . of an existing or future dispute to a disinterested person or persons for final determination' "]; *Franklin Needle Co.* v. *American Federation, etc.* (1954) 99 N.H. 101 [105 A.2d 382, 384] ["the submission of matters in controversy to the decision of disinterested persons selected by the parties as a substitute for the remedy by judicial proceedings"]; *Schaefer* v. *Allstate Ins. Co.* (Ohio 1992) 590 N.E.2d 1242, 1246-1247 [" 'arbitration' of a dispute, by definition, requires that the dispute be submitted to a neutral and independent 'arbitrator' for a decision which is final and binding *regardless of the outcome*"]; *Stradinger* v. *City of Whitewater* (1979) 89 Wis.2d 19 [277 N.W.2d 827, 831] ["a proceeding voluntarily undertaken by parties who want a dispute determined on the merits of the case by an impartial decision maker of their choosing, which decision the parties agree to accept as final and binding"]; *Lawless* v. *Cedar Vale Regional Hosp.* (1993) 252 Kan. 1064 [850 P.2d 795, 800] ["the referral of a dispute to an impartial (third) person chosen by the parties to the dispute who agree in advance to abide by the arbitrator's award issued after a hearing at which both parties have an opportunity to be heard"]; *Voss* v. *City of Oklahoma City* (Okla. 1980) 618 P.2d 925, 927 ["the referral of a dispute by the voluntary agreement of the parties to one or more impartial arbitrators for a final and binding decision as a determination of their dispute"].)[5]

For the foregoing reasons, we conclude that, although arbitration can take many procedural forms, a dispute resolution procedure is not an arbitration unless there is a third party decision maker, a final and binding decision, and

---

[5]Our conclusion is also consistent with the views of the Commission on the Future of Worker-Management Relations which was appointed by the United States Secretary of Labor to make recommendations regarding various employment related issues. (Commission on the Future of Worker-Management Relations, Report and Recommendations (Dec. 1994).) The commission has articulated certain standards that must be met before a private arbitration can serve as a legitimate form of private enforcement of public employment law. First among these standards is "a neutral arbitrator who knows the laws in question and understands the concerns of the parties." (*Id.* at p. 31.)

a mechanism to assure a minimum level of impartiality with respect to the rendering of that decision.[6]

## 2. *The Review Committee Procedure Is Not an Arbitration Procedure*

Arbitration is the submission of a dispute to a third party. Under the review committee procedure at issue in this case, the Hotel is the sole decision maker. Everyone involved in the decisionmaking process is employed by, selected by, and under the control of the Hotel. Employees of the Hotel sit on the committee; the general manager of the Hotel breaks tie votes; the committee is chaired by an employee from the personnel department. The employee does not select any committee member and must accept the roles that the Hotel has assigned to the general manager and the personnel department.

For a procedure to constitute arbitration there must be some mechanism for ensuring a minimum level of impartiality. As we have seen, this mechanism can take many different forms. Party-affiliated representatives or otherwise partial decision makers can play a role in an arbitration when the procedure also contains some impartial means of resolving those disagreements which cannot be resolved by the partial decision makers. In the present case, the effective decision makers are not simply party-affiliated; they are one of the parties to the dispute. The other party, the employee, has no representative among the decision makers to counterbalance the Hotel's inherent, substantial and obvious power. Nor is there any provision in the review committee procedure which even purports to afford, much less assure, impartiality.

---

[6]At oral argument, appellants' counsel suggested, inter alia, that section 1282, subdivision (d) of the Code of Civil Procedure could be construed to mean that California does not require that an arbitrator be "neutral." We reject that suggestion. Section 1282 is the lead-off section of a chapter of the code which deals with "Conduct of Arbitration Proceedings" and is itself entitled "Exercise of powers and duties of arbitrator." The statute is, thus, clearly procedural in nature. Its opening provision, subdivision (a), states that, unless otherwise agreed by the parties to the arbitration agreement, "[t]he arbitration shall be by a single neutral arbitrator." The succeeding subdivisions then all relate to the issue of *who exercises the powers and duties* of the (preferred) single neutral arbitrator if there is more than one arbitrator (§ 1282, subds. (b) and (c)) or if there is no neutral arbitrator provided for by the arbitration agreement (§ 1282, subd. (d)). The latter alternative is clearly addressed to the situation presented by, e.g., collective bargaining agreements providing for an equal number of "party arbitrators" who, of course, are not required to be neutral. (See *Tipton* v. *Systron Donner Corp.* (1979) 99 Cal.App.3d 501, 505 [160 Cal.Rptr. 303]; *International Brotherhood of Electrical Workers* v. *Silva* (1979) 96 Cal.App.3d 751, 757 [158 Cal.Rptr. 78].) And, even as to that circumstance, all the statute addresses is the purely procedural issue of who exercises the "powers and duties of a neutral arbitrator" and says that it is "a majority of the arbitrators." Nothing in this section supports appellants' contention that in California "arbitration" includes dispute resolution procedures which lack any mechanism for ensuring some level of neutrality on the part of the decision maker.

Indeed, contrary to the Hotel's contentions on appeal, the entire review committee procedure is inherently slanted in management's direction. The general manager decides, according to some unknown standards, the jurisdiction of the committee, breaks tie votes and makes the final decision about whether a witness should be required to testify.[7] The personnel department chooses the committee members, makes relevancy decisions and also has control over who may testify. It is even suggested that committee members need not to be objective; their job is to "ensure that major decisions affecting the employment of individual employees is [*sic*] made in accordance with Hotel policy." Hotel policies may never be challenged by employees or altered by the committee.

Arbitration should give both parties an opportunity to be heard. Contrary to appellants' contention on appeal, the review committee procedure does

---

[7]At oral argument, appellants attempted to legitimize the general manager's role by relying on *Dryer v. Los Angeles Rams* (1985) 40 Cal.3d 406 [220 Cal.Rptr. 807, 709 P.2d 826] (*Dryer*). The *Dryer* plaintiff was a professional football player whose employment contract contained a "standard provision calling for binding arbitration under the terms of the applicable collective bargaining agreement." (*Id.* at p. 409.) The lower court refused to compel arbitration of the plaintiff's contract dispute because the collective bargaining agreement provided that grievances which involved " 'the integrity of, or public confidence in, the game of professional football' " could be withdrawn by the commissioner from the standard arbitration procedures and handled pursuant to a different specified procedure. (*Id.* at p. 410.) The lower court concluded this provision rendered the arbitration procedure unconscionable under *Graham, supra,* 28 Cal.3d 807.

The Supreme Court reversed, holding that (1) applying *Graham* under these circumstances conflicted with applicable federal law, and (2) even if *Graham* applied, the procedure was not unconscionable. (*Dryer, supra,* 40 Cal.3d at pp. 414-415.) With regard to its second holding, the *Dryer* court reasoned that the provision for commissioner intervention applied only as a contingent procedure in a narrowly circumscribed category of disciplinary matters and that there was no indication the provision would apply in that case, involving as it did a contract dispute, not a disciplinary matter. (*Id.* at p. 416.) The court concluded that, in light of the narrow range of cases in which the potentially objectionable provision could be invoked, the trial court erred by invalidating the entire National Football League arbitration machinery. (*Id.* at p. 417.)

The issue in *Dryer* was not whether the parties agreed to arbitrate their disputes, but whether one provision of the arbitration agreement was unconscionable so as to invalidate the entire procedure. In contrast, in the present case we must determine whether the review committee procedure constitutes arbitration at all. The general manager's role is not the only aspect of the procedure which is inconsistent with our definition of arbitration and cannot be evaluated in a vacuum. Further, the general manager's power under this procedure is not analogous to the limited role the commissioner played in *Dryer*. The general manager directly participates in the decisionmaking process whenever there is a tie vote in the committee. Thus, even when the employee succeeds in obtaining the support of nonmanagement committee members (an event we doubt occurs as frequently as appellants suggest) the general manger has the power to step in to ensure that decisions will favor the Hotel. Further, even when the general manager does not vote, he or she has *unfettered power* to determine the jurisdiction of the committee and also controls whether witnesses will appear or otherwise participate in the proceedings.

not guarantee the employee such an opportunity. Indeed we are dismayed by appellants' bold contention that their procedures "provide all of the procedures that Plaintiff would have in a trial court, without the consequent delay or expense." A terminated employee is expressly precluded from challenging Hotel policy, procedure or rules. She is strongly discouraged from retaining counsel and is advised to seek assistance from the personnel department if she needs help presenting her case. And, in stark contrast to the trial procedures with which we are familiar, under Hotel procedure the jurisdiction of the committee, the relevancy of evidence and the presentation of witnesses are all matters within the unfettered discretion of one of the parties to the dispute, the Hotel.

None of the authority relied on by appellants supports their assertion that the review committee procedure constitutes arbitration. Appellants rely on cases holding that a terminated employee can state a tort cause of action for breach of the implied covenant of good faith and fair dealing when his former employer failed to follow express personnel procedures prior to termination (see *Gray* v. *Superior Court* (1986) 181 Cal.App.3d 813 [226 Cal.Rptr. 570]), or to permit a terminated employee to utilize the employer's formal grievance procedure (*Cleary* v. *American Airlines, Inc.* (1980) 111 Cal.App.3d 443 [168 Cal.Rptr. 722]). Not only were these cases expressly disapproved in *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 700, fn. 42 [254 Cal.Rptr. 211, 765 P.2d 373], they are irrelevant to the question of whether the Hotel's procedure constitutes an arbitration.

Appellants also refer us to cases from other jurisdictions which hold that an employee cannot sue for breach of the implied contract contained in an employee handbook when that employee has failed to exhaust grievance procedures also contained in the handbook. (See *Fregara* v. *Jet Aviation Business Jets* (D.N.J. 1991) 764 F.Supp. 940, 950-953; *Dahlman* v. *Oakland University* (1988) 172 Mich.App. 502 [432 N.W. 2d 304].) These cases do not hold that grievance procedures which are controlled exclusively by the employer constitute arbitration agreements and are thus not relevant to the dispositive issue in this appeal.[8]

Finally, appellants attempt to analogize this case to *Painters, supra,* 128 Cal.App.3d 1032. In *Painters,* Division One of this court affirmed an arbitration award rendered by a "joint adjustment board" against a painting

---

[8]The question whether respondent should have exhausted the Hotel's grievance procedure before filing suit is not before us. Indeed, at the hearing before the trial court, appellants expressly declined to pursue that question and maintained, instead, that their procedure constituted arbitration.

contractor pursuant to the terms of a collective bargaining agreement. The agreement provided that employment grievances and disputes would be submitted to the board for a "final and binding determination," that the board would be comprised of an equal number of contractor representatives and union members, and that if the board could not reach a decision, a neutral arbitrator would be selected to render a final and binding decision. (*Id.* at p. 1036.) The *Painters* court rejected appellant's contention that the parties did not agree to arbitrate. The court reasoned that, even though the agreement did not identify the grievance procedure as an arbitration, the nature and intended effect of the procedure sufficiently established that the parties agreed to arbitrate. (*Ibid.*)

The nature and intended effect of the procedure at issue in *Painters* differs markedly from the procedure at issue in the present case. The decision maker in *Painters* was a board composed of equal numbers of representatives of both parties and a neutral arbitrator. Further, there was concrete evidence both parties viewed the board's decision as a final ruling on the matter. (*Painters*, *supra*, 128 Cal.App.3d at p. 1037.) In contrast, and for the reasons already discussed, the nature of the review committee procedure at issue in this case is inconsistent with the arbitration concept; a procedure under which one of the parties to the dispute is effectively the decision maker is not an arbitration.[9] Further, and as we discuss next, we find insufficient evidence in this record that the parties intended for the review committee procedure to have the effect of binding arbitration.

B. *The Parties Did Not Intend That the Review Committee Procedure Constitute Binding Arbitration*

Several factors support our additional conclusion that the parties did not intend to enter into a binding arbitration agreement. First, the Hotel's literature describing the review committee procedure suggests that the Hotel viewed the procedure as an "internal problem solving" mechanism and not as a substitute for litigation. Of course, the Hotel was not required to use the term "arbitration," but we cannot infer an intent to arbitrate when the procedure described by the Hotel is inconsistent with the definition of arbitration. This point is illustrated by the language used by appellants in

---

[9] Appellants rely on the public policy favoring arbitration to support their contention that the review committee procedure should be deemed an arbitration. In our view, that policy would only be undermined by perverting the concept of arbitration to include within its scope a procedure in which one party controls the entire decisionmaking process. (Cf. *Saika* v. *Gold* (1996) 49 Cal.App.4th 1074, 1081 [56 Cal.Rptr.2d 922] [public policy favoring arbitration is "manifestly undermined by provisions in arbitration clauses which seek to make the arbitration process itself an offensive weapon in one party's arsenal"].)

their petition to compel arbitration filed in the trial court. Appellants were careful there not to allege that respondent agreed to submit to arbitration. Instead, they alleged she agreed to comply with "internal dispute resolution procedures." Elsewhere in the petition, appellants equated the terms "internal dispute resolution procedures" and "alternative dispute resolution" with the term "arbitration." The terms are simply not interchangeable; evidence of an employer's intent to create a procedure by which it can address its employment problems is not evidence of anyone's intent to arbitrate.

By the same token, evidence that an employee has accepted its employer's "request" to agree to participate in an *internal* grievance procedure is not evidence the employee intended to enter into a binding arbitration agreement. Notwithstanding the statements in Hotel literature that committee decisions will be final and binding, we simply cannot accept the proposition that the average employee who agrees to comply with the terms of the Handbook views the review committee procedure as a binding arbitration or intends to waive his or her right to a judicial forum.

We also find support in the record for respondent's contention that the review committee procedure was not mandatory but voluntary and therefore was not intended to be tantamount to an arbitration agreement. This contention is supported by the permissive language used in the Handbook to describe the procedure; e.g., "[y]ou *may* bring your problem or concern to the Renaissance Review Committee." In addition, respondent submitted evidence that she and other employees, including members of management, believed that participation in the review committee procedure was optional. Indeed, appellants' own evidence indicates the Hotel viewed the procedure as voluntary. Appellants have included in this record a copy of their petition to confirm an arbitration award made by the review committee against a former employee named Henry Tran, and a trial court order confirming that award.[10] In the Tran petition, appellants characterized the final step of their "internal problem solving procedure" as the "voluntary submission of a dispute" to their review committee.

In summary, we conclude that there is no arbitration agreement between the parties in this case. The review committee procedure is not an arbitration procedure because there is no third party decision maker, the procedure

---

[10]Appellants use the Tran matter to argue the review committee procedure has already been found to constitute binding arbitration. Of course, we are not bound by a superior court decision. Further, our review of the Tran materials indicates that very different issues were presented by that case. For example, after Tran was terminated, and with the full knowledge and consent of his attorney, he entered into a written agreement to submit his dispute to the committee.

totally lacks impartiality, and it is controlled exclusively by one of the parties to the dispute. Further, evidence that the procedure was conceived as a way for the Hotel to resolve internal problems and that participation in the review committee procedure was intended to be voluntary is additional support for the conclusion that the parties did not intend to enter into a mandatory arbitration agreement. Since there is no arbitration agreement between the parties in this case, appellants' petition to compel arbitration was properly denied.

## IV. Disposition

The August 3, 1995, order denying appellants' motion to compel arbitration is affirmed.

Kline, P. J., and Lambden, J., concurred.

A petition for a rehearing was denied November 22, 1996, and appellants' petition for review by the Supreme Court was denied February 19, 1997.