Filed 7/8/21  GRP2 Uniforms v. Galls CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| GRP2 UNIFORMS, INC., et al., | |
| Plaintiffs and Respondents, | G059558 |
| v. | (Super. Ct. No. 30-2019-01093801) |
| GALLS, LLC, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of Orange County, Frederick P. Horn, Judge.  (Retired judge of the Orange Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Goodwin Procter, Andrew Kim and Galen A. Phillips for Defendant and Appellant.

Payne & Fears, Daniel L. Rasmussen and David A. Grant for Plaintiffs and Respondents.

\*          \*          \*

## INTRODUCTION

Appellant and defendant, Galls, LLC (Galls), appeals from an order denying its petition to compel arbitration of claims asserted by respondents and plantiffs, Hong Li Hawkins, GRP2 Uniforms, Inc. (GRP2) and OGA USA, Inc. (OGA).[1] The parties signed a contract for Galls to acquire two distribution businesses for an "[e]stimated [p]urchase [p]rice" of $4 million subject to postsigning valuation adjustments. The contract contains a dispute resolution subsection providing for an independent accounting or financial consulting firm to resolve disputes about whether the postclosing statement at issue "contained arithmetic errors or was not prepared in accordance with" the contract or referenced accounting rules.

Galls filed a motion to compel arbitration and the trial court denied the motion for all but one claim. In a nutshell, the court ordered a claim for breach of contract[2] into alternative dispute resolution and denied the motion with regard to claims for reformation, fraud, violation of Business and Professions Code section 17200, and declaratory relief. Galls contends the court did not correctly construe the dispute resolution subsection. We conclude the court did not err because the narrow subsection covers accounting disputes and not the noncompelled claims. Accordingly, we affirm the order.

---

[1] Hawkins was the president and majority shareholder of GRP2 and OGA. We refer to them collectively as the Sellers and do not distinguish between them in this appeal unless material to our discussion. We also approximate numerical amounts for simplicity.

[2] The Sellers' third claim, for breach of contract, was compelled to arbitration based on a collateral subagreement that is immaterial to this appeal.

## A. The Acquisition Contract's "Post-Closing Statement" Terms

In January 2018, Galls began negotiations to acquire two of the Sellers' distribution businesses in the public safety uniform industry (collectively the target businesses). For over a year, the parties "exchanged hundreds of [e-]mails, letters, phone calls, and tens-of-thousands of documents." A certified public accounting firm audited the businesses and in April 2019, the Sellers and Galls signed a contract for Galls to acquire the businesses (the acquisition contract).

The contract set forth an "[e]stimated [p]urchase [p]rice" of $4 million that would be adjusted through postsigning valuations. Within two days of signing, Galls delivered $3.2 million to the Sellers and held back $800,000 as a reserve, pending the determination of a final adjusted purchase price. The final price would be "determined in accordance with [the contract] and [one of its incorporated exhibits, referred to as] the Balance Sheet Rules." The rules governed what could and could not be included in calculations to create a "Post-Closing Statement" that would determine the final adjusted purchase price.[4] Galls would "prepare and deliver" the statement to the Sellers within 90 days of the parties signing the contract.

---

[3] The "background" is taken from the allegations of the complaint and the words of the contract.

[4] The Balance Sheet Rules consisted of 10 paragraphs. Most generally, three paragraphs provided that certain categories of money "[a]mounts recorded on the Post-Closing Statement" would be "calculated" or "valued in accordance with" Generally Accepted Accounting Principles (GAAP). Two paragraphs specified what would be included and excluded from "Net Working Capital" and six set forth what "amounts" would or would not be "recorded on the Post-Closing Statement." For example, the ninth paragraph specified that "[a]mounts recorded on the Post-Closing Statement with respect to inventory shall be determined pursuant to the definition of Inventory, provided that reserves with respect to inventory that is of a quantity or quality that does not meet industry standards and for that reason is not reasonably useable and salable by the Seller in the ordinary course of business shall be calculated in accordance with GAAP."

Under the acquisition contract, the Post-Closing Statement's calculation of a final adjusted purchase price would be a function of calculating the target businesses' "Working Capital," the same as the contract's definition of "Net Working Capital," for the purposes of our discussion. This net amount would be subtracted from a "Base Amount," defined elsewhere in the contract as $3.8 million. If there was money left over after the subtraction, the remainder would be deemed a "Closing Working Capital Overage." On the other hand, if the subtraction resulted in a negative number, it would be deemed a "Closing Working Capital Underage." Ultimately, if Galls's calculation of the businesses' Net Working Capital was lower than $3.8 million (the Base Amount), then the difference (i.e., an Underage) would reduce the estimated purchase price of $4 million by that difference. Conversely, if Net Working Capital was valued higher than $3.8 million, the difference (i.e., an Overage) would be added to the estimated purchase price.

The acquisition contract's definition of "Net Working Capital" incorporated an exemplar called "Exhibit D" that Galls sent to the Sellers the day before the contract was signed. It "[s]et forth . . . an illustrative calculation of [the] Net Working Capital of [the target businesses]" as of two months before signing. Exhibit D itemized preadjustment and postadjustment calculations for the businesses' net assets. Among other assets, it showed the businesses' inventory valued preadjustment at $3.2 million and did not alter this amount postadjustment. It calculated a total value for preadjustment net assets of $2 million and a postadjustment "Closing Working Capital" total of $2.7 million, meaning it showed adjustments increasing the value of the businesses' net capital by $700,000.

Beneath all of the calculations in Exhibit D, there was a "Note" section stating: "This balance sheet was *not* prepared in accordance with the Balance Sheet Rules, as there are significant differences compared to the monthly policies and practices that the [the target businesses] use[]. For the avoidance of doubt, Closing Working

Capital [i.e., in the Post-Closing Statement] will be determined in accordance with the Balance Sheet Rules." (Italics added.)

## B. The Contract's Dispute Resolution Subsection

In the acquisition contract's "Article III" is a "Dispute Resolution" subsection (the DRS). It states in the most relevant parts that:

"[T]he Sellers may object to the Post-Closing Statement by notifying [Galls] in writing of each objection and a reasonably detailed description of the basis therefor (but only on the basis that the Post-Closing Statement contained arithmetic errors or was not prepared in accordance with this [acquisition contract] and the Balance Sheet Rules). Any component of the Post-Closing Statement that is not subject to an objection by the Sellers within such period shall be conclusive and binding on the Parties. The Parties shall use reasonable efforts to resolve any objections . . . , and if they are unable to do so . . . the Sellers and [Galls] shall submit any remaining disputes, and only such remaining disputes, to Alvarez & Marsal or if Alvarez & Marsal is not willing to serve in such capacity, then such other independent accounting or financial consulting firm upon whom the Sellers and [Galls] shall mutually agree, or if no such other firm is willing to serve in such capacity, then such other qualified Person upon whom the Sellers and [Galls] shall mutually agree (the 'Accountants') for review and resolution. . . . The fees charged by the Accountants shall be borne pro rata as between the Sellers, on the one hand, and [Galls], on the other hand, in proportion to the final allocation made by the Accountants of the disputed items weighted in relation to the claims made."

## C. Galls's Post-Closing Statement

The parties signed the acquisition contract in April 2019 and in July, Galls sent a Post-Closing Statement calculating a Closing Working Capital Underage of $3.8 million, primarily because of a downward inventory value adjustment of $2 million,

5

based on Galls's determination that a majority of the businesses' inventory was "not usable and saleable in accordance with GAAP." Galls's cover letter asserted the Sellers had to not only return all of the $3.2 million received from Galls but also deliver an additional half-million dollars to Galls, based on the Post-Closing Statement's final adjusted purchase price of $200,000 for the target businesses.

The Sellers' written response asserted Galls's Post-Closing Statement was "both untimely and nonsensical," given its calculations amounted to an attempt to acquire the Sellers's two "profitable and growing businesses" for five percent of the acquisition contract's estimated purchase price of $4 million. "[I]n an abundance of caution," the Sellers also asserted seven specific "object[ions]" to the statement. On the same day as their letter, the Sellers filed the lawsuit against Galls underlying this appeal.

**PROCEDURAL HISTORY**

*A. Complaint's Allegations*

The Sellers' lawsuit alleges five causes of action: (1) reformation of the acquisition contract based on mistake; (2) fraud; (3) breach of contract; (4) violation of the unfair competition law (Bus. & Prof. Code, § 17200 et seq.); and (5) declaratory relief. The Sellers allege they "understood and believed the [acquisition contract's] Base Amount [] refer[red] to the base or net purchase price they and Galls agreed to, meaning the amount [the Sellers] were expect[ing] to receive after the [contract's] holdbacks and adjustments were applied to the $4 million purchase price."

Among other points, the Sellers allege that two weeks before the contract was signed, the accounting firm that audited the target businesses sent the Sellers a "first set of calculations . . . entitled 'Base Amount Calculation.'" The calculations "yielded a final 'base amount' of $4.1 million, [] consistent with the agreed-upon [estimated purchase] price" in the contract. According to the Sellers, the calculations "assigned a valuation of [about $ 3.6 million] to existing inventory. This was consistent with [the

6

Sellers'] internal inventory detail [and they] agreed [the amount] was an appropriate value."

On the Exhibit D illustration that Galls allegedly sent the day before the parties signed the contract—as noted, showing an upward adjustment to the target businesses' net capital, in contrast to the Post-Closing Statement's downward adjustment—the Sellers allege they "understood and believed the [illustration] represent[ed] the parties' agreements regarding the valuation of assets [and] liabilities and the determination of a Net Working Capital amount . . . for purposes of the acquisition."

The Sellers assert they were "clear with Galls that [they] would not accept anything less than" $4 million to sell the two businesses at issue and Galls's Post-Closing Statement revealed "errors in the [contract that] resulted in a massive miscalculation of the purchase price adjustments . . . [, a] result [that] was neither the intent nor the agreement of [the Sellers], as [] documented by their communications, calculations, revisions and various drafts of the [contract]."

The Sellers allege that after receiving Galls's Post-Closing Statement, the Sellers "immediately sought to resolve the mistakes in the [a]cquisition [contract] with Galls only to find that Galls . . . was unwilling to amend the [contract] to correct the errors, internal inconsistencies, and miscalculations. Having no other recourse, [the Sellers filed suit] to reform the [contract] to conform to the agreements and representations of the parties[, among other things] . . . . [The Sellers] also seek injunctive relief and recovery of damages for money owed by Galls, which it has failed to pay in breach of the parties' agreement."

### B. Galls's Motion to Compel Arbitration and the Trial Court's Denial

Galls filed a motion to compel arbitration for all five of the Sellers' claims and the trial court denied the motion on all but one claim. Specifically, the claims the

court declined to compel to arbitration were for reformation of the acquisition contract based on mistake, fraud, violation of the unfair competition law, and declaratory relief (collectively the noncompelled claims). In an oral statement of findings, the court concluded Galls had not shown the DRS amounted to an agreement to arbitrate these claims. Among other points, the court noted disorganization in the acquisition contract and the lack of a provision in the DRS for the parties to conduct discovery.

## DISCUSSION

Galls requests us to reverse the trial court's order denying arbitration of the noncompelled claims. Galls argues these "claims fall squarely within" the acquisition contract's DRS because they all amount to "claims that the Post-Closing Statement was not prepared 'in accordance with' what [the Sellers] believe the [acquisition contract] should say."

### I. Standard of Review

The parties disagree on the correct standard of review to apply. Galls contends we should independently construe the DRS under a de novo standard of review whereas the Sellers contend the trial court's ruling turned on extrinsic evidence so we should review for substantial evidence and defer to the court's findings of facts.

We review de novo because there was no competent extrinsic evidence in conflict on the meaning of the DRS. (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955 (*Founding Members*).) The record shows the trial court decided that the plain words of the acquisition contract controlled the issue and did not consider extrinsic evidence. We agree with the court because there was nothing in the evidence offered that proved a meaning of the DRS. Although extrinsic evidence is generally admissible to prove a meaning to which a contract is reasonably susceptible and the Sellers submitted a

8

declaration by Hawkins about her subjective understanding of the DRS, her assertions were insufficient under California's objective theory of contracts. (*Id*. at p. 956.)

## II. Arbitrability and Contract Interpretation Principles

### A. *An Arbitration Agreement Exists*

The threshold issue is whether the DRS amounted to an agreement to arbitrate. A petitioner seeking to enforce a purported arbitration agreement (Code Civ. Proc., § 1281.2) "'bears the burden of proving the existence of a valid [] agreement by the preponderance of the evidence.'" (*Titolo v. Cano* (2007) 157 Cal.App.4th 310, 316 (*Titolo*), quoting *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972.)

The ordinary rules of contract interpretation apply. (*Hotels Nevada, LLC v. Bridge Banc, LLC* (2005) 130 Cal.App.4th 1431, 1435.) Courts should "attempt to give effect to the parties' intentions, in light of the usual and ordinary meaning of the contractual language and the circumstances under which the agreement was made." (*Titolo*, *supra*, 157 Cal.App.4th at p. 317, quoting *Victoria v. Superior Court* (1985) 40 Cal.3d 734, 744, internal quotation marks omitted.) Courts should also aim to determine the intentions "from the writing alone, if possible," (*Founding Members, supra,* 109 Cal.App.4th at p. 955) where "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.)

In the trial court, Galls submitted a copy of the parties' signed acquisition agreement containing the DRS. The "attributes of a true arbitration agreement [are]: (1) a third party decision maker; (2) a mechanism for ensuring neutrality with respect to the rendering of the decision; (3) a decision maker who is chosen by the parties; (4) an opportunity for both parties to be heard, and (5) a binding decision." (*Cheng-Canindin v. Renaissance Hotel Associates* (1996) 50 Cal.App.4th 676, 684.) We conclude Galls met

9

its burden to show the existence of a valid arbitration agreement. Although the Sellers argue the DRS is not sufficiently "clear" to constitute an agreement to arbitrate and correctly note it does not use the word "arbitration," it is clear the parties intended a neutral third party decision maker to bind the parties on covered disputes. (See *id.* at pp. 683-685 [failure to use the word "arbitration" in a contract does not prevent parties from electing arbitration if they choose].)

### B. The Sellers Met Their Burden to Show Their Noncompelled Claims Were Not Covered by the Narrow DRS

The burden shifted to the Sellers to establish that their noncompelled claims were not covered by the DRS. (*Titolo, supra,* 157 Cal.App.4th at p. 316 ["Once the existence of a valid arbitration clause has been established," the burden shifts to "'the party opposing arbitration to demonstrate [the] clause *cannot* be interpreted to require arbitration of the dispute.' [Citation.]"].) On this issue, "'an order to arbitrate a particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.' [Citation.]" (*Id.* at pp. 316-317.)

We balance two overarching principles: "First, resolution of disputes through the process of arbitration is favored in this state, and any doubt as to the meaning and interpretation of an arbitration agreement is resolved in favor of requiring arbitration." (*Titolo, supra,* 157 Cal.App.4th at p. 317.) Notwithsstanding, "'[t]here is no public policy favoring arbitration of disputes which the parties have not agreed to arbitrate." [Citation.] Therefore, the second policy guiding our decision is that no dispute may be ordered to arbitration unless it is within the scope of the arbitration agreement." (*Ibid.*; accord Civ. Code, § 1648 ["However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract"].)

10

On whether an agreement should compel the arbitration of particular claims, "the contractual terms themselves must be carefully examined . . . [and] [¶] . . . the terms of the specific arbitration clause under consideration must reasonably cover the dispute as to which arbitration is requested." (*Bono v. David* (2007) 147 Cal.App.4th 1055, 1063.) "[T]he decision as to whether a contractual arbitration clause covers a particular dispute rests substantially on whether the clause in question is 'broad' or 'narrow.'" (*Id.* at p. 1067.) "A 'broad' clause includes those using language such as '*any claim* arising from or *related to* this agreement' [citation] while '[m]ore narrowly worded clauses' are considered 'dangerous to utilize' [citation] —presumably meaning 'dangerous' to the party wanting to arbitrate disputes under it." (*Ibid.*, quoting Knight et al., Cal. Practice Guide, Alternative Dispute Resolution (The Rutter Group 2005) ¶ 5; accord, *Rice v. Downs* (2016) 248 Cal.App.4th 175, 186-188 [discussing case law on broad and narrow arbitration clauses].)

### C. Facts Applied to the Law

As they did in the trial court, the Sellers contend the DRS is narrow because of its express limitations. We agree, based on the wording of the DRS. (*Founding Members*, *supra*, 109 Cal.App.4th at p. 955.) The trial court did not err because the DRS's words show it is a narrow clause limited to arithmetic and accounting disputes.

A fair reading of the Sellers' lawsuit allegations shows the DRS does not reasonably cover the noncompelled claims. The DRS's use of the word "only" to limit the types of covered disputes shows the parties drafted a limited clause, not one of broader scope. We give effect to the usual and ordinary meaning of the DRS's words that show the Post-Closing Statement and Balance Sheet Rule are about accounting valuations and calculations. Significantly, the DRS specifies a covered dispute to be resolved by an accountant and not a lawyer or retired judge, or anyone else with

11

experience in the law. This clause informs us as to what types of disputes the parties meant to be covered by the DRS, reinforcing our conclusion it is not a broad arbitration agreement. For example, whether fraud occurred or reformation is permitted are legal disputes, not simply accounting questions.

Our conclusion that the agreement on arbitrable disputes is narrow is further supported by the DRS's example of how the parties would pay the arbitration fee. As noted, the DRS provides for a "pro rata" apportionment of the fee and expressly illustrates the concept with an example that assumes a dispute about an accounting valuation adjustment. In the example, the disputed adjustment amount is $1,000 and there is a determination that only $300 of it should be awarded to the Sellers. The DRS specifies the Sellers, in the hypothetical situation, would be required to pay for 70 percent of the fee because they did not prevail on 70 percent of the amount in dispute. Again, the example given in the DRS reinforces our conclusion the parties intended for its arbitrability scope to be narrow.

In sum, the narrow DRS does not cover the Sellers' noncompelled claims because they are legal disputes and not accounting disputes. They are "legal claims of mistake, reformation, and fraud," as Galls itself describes them on a different point, that do not rest on assertions the acquisition contract and its Balance Sheet Rules were not followed. Thus, the Sellers' claims are broader than the narrow set of disputes covered by the DRS.

We are not persuaded by Galls's contentions to read the DRS as a broader agreement than its words allow. For example, Galls contends we should conclude the DRS "covers any dispute that requires determining the parties' rights and obligations under the [acquisition contract,] if that determination has an impact on the Post-Closing Statement." But Galls provides no meaningful discussion as to why we should discern such a broad intent in the DRS's words.

12

Galls relies on *Bigler v. Harker School* (2013) 213 Cal.App.4th 727, 738, to argue we should apply "the principle that 'broad contractual provisions for arbitration are to be liberally construed.'" But this argument assumes a premise that the DRS is broad, without demonstrating it. The traditionally broad contractual language at issue in *Bigler*—"'any dispute involving [one of the parties petitioning for arbitration]'" (*ibid.*)—by itself is clearly inapt for analogy in this case.

## DISPOSITION

The order denying Galls's motion to compel arbitration is affirmed. The Respondents are entitled to their costs on appeal.


FYBEL, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.