[No. G033340. Fourth Dist., Div. Three. Aug. 31, 2004.]

In re KAREN G., a Person Coming Under the Juvenile Court Law.
ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and
Appellant,
KAREN G., Objector and Appellant, v.
SUSANA O., Defendant and Respondent.

## Counsel

Benjamin P. de Mayo, County Counsel, Dana J. Stits and Jeannie Su, Deputy County Counsels, for Plaintiff and Appellant.

Marsha Faith Levine, under appointment by the Court of Appeal, for Objector and Appellant.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Respondent.

OPINION

SILLS, P. J.—Karen G. appeals from the jurisdictional and dispositional order adjudicating her a dependent and returning her to her mother under a plan of family maintenance. Subsequent events, however, have caused her counsel to seek a dismissal of the appeal. We grant the request to dismiss.

## FACTS

Karen G. was 15 months old when she was admitted to Saddleback Hospital with a spiral fracture to her femur in May 2003. Further examination revealed a healing skull fracture, a healing burn to her hand, and an older fracture to her arm. The injuries were diagnosed as "suspicious for non-accidental trauma." Karen's only caretakers were her mother; her aunt, Vianey G.; and her uncle, Manuel G. None of them had a satisfactory explanation for the injuries.

The mother explained she lay down with Karen around 9:00 p.m., and they fell asleep in one of the two twin beds that were pushed together. The mother got up shortly after midnight to go to work, leaving Karen sleeping in the bed. Around 1:00 a.m., Manuel heard Karen crying and found her facedown on the carpeted floor of the bedroom. Her body was at a right angle to the two beds, with her feet near the space between them. He picked her up and gave her a bottle; she fell asleep in his arms. When Vianey arrived home 10 minutes later, they put Karen back to bed. Karen awoke again around 3:00 a.m., and her leg was obviously swollen and red. Vianey and Manuel decided to call the mother, who came home from work and found Karen asleep in Manuel's arms. She took Karen to the hospital.

Karen was detained by the Orange County Social Services Agency (SSA), which filed a dependency petition on her behalf under Welfare and Institutions Code section 300, subdivision (a) [serious physical harm inflicted nonaccidentally by parent or guardian], subdivision (b) [failure to protect], and subdivision (e) [severe physical abuse by a parent to a child under five].[1] SSA recommended reunification services to the mother because she and Karen appeared to have a good relationship. The trial on the petition was continued several times; as a result, the hearing did not commence until September 4, 2003, almost four months after the date the petition was filed. The hearing was held on 11 different days spanning the months of September, October, November and December.

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

During the seven months between detention and the end of the jurisdictional and dispositional hearing, the mother participated in reunification services. She completed parenting classes, faithfully attended a child abuse group, participated in counseling, communicated with the social worker, and moved to a new residence. By the time of the hearing, the mother's visits with Karen were increased to three times a week, monitored. The social worker testified, "The child connects with her, responds to her. They appear to have a healthy relationship, and it's probably one of the easiest visits anyone has probably had to observe because it's very appropriate."

During the hearing, the court heard testimony from, inter alia, the mother; Vianey and Manuel, the aunt and uncle; Dr. Clare Sheridan-Matney, an expert in child abuse; Dr. Jacqueline Winkelmann and Dr. Peter Czuleger, two of Karen's treating doctors; Mitra Bustamante, the social worker; and therapist Monika Summerfield. The mother, Vianey, and Manuel all claimed the injuries were accidents. None of them believed the others could have hurt Karen.

The mother claimed Karen injured her arm about one and one-half months before the injury to her leg. She lost her balance while she was walking down a step and braced her fall with her arm. The mother said Karen slept through the night but was "guarding" her arm the next morning. The mother took her to the hospital "where she was told it was a 'minor' fracture and she was given a sling." She was referred to a specialist, and the mother claimed the specialist said the injury was only a "fissure," not a fracture. But the medical records stated Karen had a fracture and should have a follow-up appointment in two weeks. The mother admitted she did not attend that appointment.

The mother did not see Karen's hand get burned, but she surmised it happened when she and a friend were cooking two or three weeks before. Karen came into the kitchen several times and may have gotten too close to the stove. The mother did not notice the burn until the next day, and she then treated it with aloe vera. She did not think it was serious. The mother had no idea how the skull fracture occurred.

Dr. Winkelmann testified it was unlikely the broken leg resulted from a fall from a bed onto a carpeted floor. "The force and mechanism of a spiral fracture—it usually actually always implies a severe twisting motion, so there has to be something more than a fall." She admitted there was a "small possibility" that a spiral fracture could have resulted from Karen getting her leg stuck between the two beds and then falling, "but . . . unlikely because of the force required." Dr. Winkelmann also believed Karen would not have

been consolable nor would she have fallen asleep after the break, as the family claimed, because of the severe pain. She found the mother's story about the burn hard to believe for the same reason: Such a severe burn (second or third degree) would have caused Karen to cry out in pain.

Dr. Czuleger testified the mother's story about the broken arm was unusual, but not impossible. He testified such an injury was not uncommon and could occur either accidentally or nonaccidentally.

Dr. Sheridan-Matney believed the family's explanation for the injuries was not credible. Based on "the multiplicity of all of the injuries, coupled with the lack of adequate history to explain them," she believed Karen "was or is a battered child."

The social worker testified she recommended family reunification services for Karen and the mother because she was "not certain [the mother] had inflicted all the injuries upon the child." The mother had been "actively working her case plan," but needed to "be open to the possibility that this child was actually abused and that these injuries were not accidental." The court asked Bustamante whether she would recommend returning Karen to the mother if she "does everything you ask her" but did not admit the injuries were not accidental. Bustamante said she would be concerned "about whether [the mother will] be able to protect the child in the future" and "quite possibly" would not recommend returning Karen to the mother.

The therapist testified she had seen the mother for 10 individual therapy sessions and was in the "middle stage" of treatment with her. The mother maintained Karen's injuries were accidental, but "she has admitted from her part to have been neglectful in that the child was not always supervised accordingly to prevent the injuries." The mother attended her sessions regularly and demonstrated progress by being "able to talk about the abuse and the injuries and the care of the child and what would be a more appropriate caring for the child and what support [she'd] need."

When rendering its decision, the juvenile court stated, "This is the most difficult matter that I've ever been presented with." After going through the evidence about each injury, the court found it had not been proven that the injuries were nonaccidental. "I do not believe it's more likely than not" that the injuries were sustained from abuse, although the court was "suspicious." Accordingly, it dismissed the counts of the petition under section 300, subdivisions (a) and (e) and sustained the petition under subdivision (b). It ordered Karen to be returned to the mother under a plan of family mainte-nance with in-home services. The mother was ordered not to live in the same household as Vianey and Manuel, and a social worker was to make two

unannounced visits per week. The court refused to stay its order pending appeal because it was "much more convinced that this child will be safe."

SSA and trial counsel for Karen filed notices of appeal; appellate counsel was appointed for Karen. SSA filed its opening brief, and Karen's appellate counsel joined in it.[2] The mother filed a respondent's brief. Then, SSA filed a request to dismiss the appeal because "[d]ependency cases are not static and circumstances change." At the six-month review hearing, SSA had changed its position and recommended that Karen remain with her mother. The juvenile court adopted SSA's recommendations, ordered Karen to remain with her mother under supervision, and set the next six-month review hearing for November 2004. SSA explained, "[O]ver the course of the last six months [the mother] complied with SSA's service plan and the trial court's orders. Karen has thus far remained safe and suffered no further injuries. . . . SSA can no longer in good faith maintain its appeal and tax this Court's resources." We granted SSA's request to dismiss its appeal, leaving Karen's appeal pending.

Subsequently, Karen's appellate counsel also sought to dismiss her appeal because "in light of the circumstances outlined in SSA's request for dismissal and as reflected in the juvenile court's minute order . . . [I] believe[] the issues raised in the appeal are now moot . . . ." She discussed the matter with Karen's trial counsel, who "apparently" shared her opinion. She asked for guidance, however, because of a recent case, *In re Josiah Z.* (2004) 118 Cal.App.4th 944 [13 Cal.Rptr.3d 456], which held that appellate counsel for a dependent child has no authority to seek dismissal of the child's appeal based on counsel's analysis of the child's best interests. All parties waived oral argument, and the case was submitted for decision. In the interim, however, the Supreme Court granted review in *In re Josiah Z.* (S125822, July 28, 2004). Accordingly, we consider the request for dismissal without any citeable legal precedent. (Cal. Rules of Court, rules 976, 977, 979.)

## DISCUSSION

In *In re Zeth S.* (2003) 31 Cal.4th 396 [2 Cal.Rptr.3d 683, 73 P.3d 541], this court was admonished for relying on postjudgment events to reverse orders terminating parental rights. "Under the Court of Appeal's expansive view of the scope of an appeal of an order terminating parental rights, postjudgment evidence of circumstances involving the minor's present out-of-home custody status during the pendency of the appeal would be routinely and liberally considered. Appointed counsel for the minor in the appeal would

---

[2] The mother also filed a notice of appeal, but later elected to participate only as a respondent.

be encouraged, and indeed obligated, to independently investigate such evidence outside the record and bring it to the reviewing court's attention for consideration in the appeal. Basic formalities such as the need for a notice of appeal, and the requirement that issues raised on appeal first be raised in the trial court, would be dispensed with, and a best interests standard of review, applied anew from the perspective of the reviewing court, would be utilized to determine whether the juvenile court's judgment should be reversed and the case remanded for a new [section] 366.26 hearing, even where the juvenile court itself has committed no legal error in terminating parental rights on the record evidence before it." (*Id.* at p. 412.)

■ The Supreme Court's concerns in *Zeth S.* are not present here. First, the order from which this appeal is taken is not an order terminating parental rights. Termination orders are "conclusive and binding" and "[a]fter making the order, the [juvenile] court shall have no power to set aside, change, or modify it, but nothing in this section shall be construed to limit the right to appeal the order." (§ 366.26, subd. (i).) In contrast, a jurisdictional and dispositional order is subject to modification pursuant to a proper showing of changed circumstances under section 388, as are all subsequent orders except a final termination of parental rights. The Legislature has thus recognized the dynamic and changing nature of dependency proceedings by creating a mechanism for the trial court to acknowledge changing circumstances.

■ Second, the basis for the requested dismissal is evidence of which we can take judicial notice, not the unsworn statements of counsel that so concerned the *Zeth S.* court. "Judicial notice may be taken of . . . [¶] . . . [¶] [r]ecords of . . . any court of this state . . . ." (Evid. Code, § 452; see also Evid. Code, § 459.) The minute order of the juvenile court at the six-month review hearing indicated that the recommendation of SSA had changed and that Karen was ordered to remain with her mother. Thus, the changed circumstances are properly before this court.

It is not uncommon for an appellate court to take judicial notice of subsequent proceedings in the juvenile court and find the appeal has been rendered moot. That is the case here. Even if we found the juvenile court erred by failing to sustain jurisdiction under subdivision (e) of section 300 and by ordering Karen to return home under a plan of family maintenance, we would not grant the relief originally requested by the appellants, i.e., order the juvenile court to sustain the section 300, subdivision (e) count of the petition and remove Karen from her mother. In light of the six-month findings, the requested relief is no longer appropriate.

## DISPOSITION

The appeal is dismissed.

Moore, J., and Fybel, J., concurred.