[No. A113388. First Dist., Div. Four. Jan. 11, 2008.]

WINSTON LAMBERT et al., Plaintiffs and Appellants, v.
CHRIS CARNEGHI et al., Defendants and Respondents.

**COUNSEL**

Moody & Hill and E. Craig Moody for Plaintiffs and Appellants.

Archer Norris, Jon P. Tonsing and W. Eric Blumhardt for Defendant and Respondent Chris Carneghi.

Allen & Bender, Michael B. Allen, Jonathan D. Bishop; Lewis Brisbois Bisgaard & Smith and Michael K. Johnson for Defendant and Respondent Robert Dailey.

**OPINION**

**SEPULVEDA, J.**—Appellants Winston and Elaine Lambert sued respondents Chris Carneghi and Robert Dailey for negligence over their alleged failure to adequately advance their position in a fire insurance appraisal proceeding pursuant to Insurance Code section 2071 (section 2071). The trial court sustained respondents' demurrers, and appellants appealed from the subsequent judgments. We conclude that an appraisal proceeding pursuant to section 2071 is an arbitration, and that respondent Carneghi was immune from suit over his role as an appraiser. However, we find that the litigation privilege

(Civ. Code, § 47, subd. (b)) does not protect respondent Dailey from suit over his role as an expert hired by appellants. We therefore affirm the trial court's order sustaining respondent Carneghi's demurrer, but reverse the trial court's order sustaining Dailey's demurrer.

I.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

"The appeal in this case is from a judgment of dismissal entered after the sustaining of a general demurrer. Accordingly, in setting forth the relevant facts for purposes of our review, we are guided by the familiar rules applicable in this setting. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions, or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed. [Citation.]' [Citation.]" (*Moore v. Conliffe* (1994) 7 Cal.4th 634, 638 [29 Cal.Rptr.2d 152, 871 P.2d 204].) We cannot, and do not, consider the declaration of respondent Dailey that was submitted to the trial court in connection with his demurrer, because the limited role of the demurrer is to test the legal sufficiency of the complaint. (*Donabedian v. Mercury Ins. Co.* (2004) 116 Cal.App.4th 968, 994 [11 Cal.Rptr.3d 45].)

Appellants owned a home in Los Altos Hills that was totally destroyed by an accidental fire in March 1995. The residence was insured by a policy issued by Fire Insurance Exchange (FIE), which determined that the policy fully covered the fire damage. Appellants' policy provided "guaranteed replacement cost coverage," as well as a " 'building ordinance or law coverage' endorsement, which provided that FIE would also pay the full replacement cost to replace or repair the Lamberts' residence in conformity with applicable laws, processes and regulations respecting the premises." (Italics omitted.) FIE hired two appraisers, and provided appellants with checks based on the appraisers' reports. Appellants accepted the checks with the understanding that they represented a deposit until a determination of the full replacement cost of their residence.

It took approximately four years for appellants to obtain the necessary permits to replace their home. During this time, appellants incurred "a very substantial amount of rent and other 'soft costs' in architectural, legal, surveying, engineering consulting fees, town fees and interest expenses, etc." FIE and appellants were unable to agree on the replacement cost value to

---

[1] Appellants filed their complaint on March 29, 2005. Before any responses to the complaint were filed, appellants filed their first amended complaint on June 13, 2005. The following facts are taken from appellants' first amended complaint.

rebuild appellants' entire home. Appellants therefore invoked their right to appraisal in accordance with the terms of their insurance policy.

Appellants did not attach a copy of their FIE insurance policy to their complaint; however, the parties agree that FIE was required under California's Insurance Code to include the following provision in its fire policy regarding appraisals:[2] "In case the insured and this company shall fail to agree as to the actual cash value or the amount of loss, then, on the written request of either, each shall select a competent and disinterested appraiser and notify the other of the appraiser selected within 20 days of the request. Where the request is accepted, the appraisers shall first select a competent and disinterested umpire; and failing for 15 days to agree upon the umpire, then, on request of the insured or this company, the umpire shall be selected by a judge of a court of record in the state in which the property covered is located. Appraisal proceedings are informal unless the insured and this company mutually agree otherwise. For purposes of this section, 'informal' means that no formal discovery shall be conducted, including depositions, interrogatories, requests for admission, or other forms of formal civil discovery, no formal rules of evidence shall be applied, and no court reporter shall be used for the proceedings. The appraisers shall then appraise the loss, stating separately actual cash value and loss to each item; and, failing to agree, shall submit their differences, only, to the umpire. An award in writing, so itemized, of any two when filed with this company shall determine the amount of actual cash value and loss. Each appraiser shall be paid by the party selecting him or her and the expenses of appraisal and umpire shall be paid by the parties equally." (Italics omitted; see Ins. Code, §§ 2071, 2070.)

Appellants hired attorneys to represent them in the appraisal process. One of the attorneys hired respondent Dailey as an expert "to define, describe and estimate the *replacement* cost" of appellants' home for the appraisal process. (Original italics.) Appellants also hired respondent Carneghi as their appraiser, "to provide appraisal services in connection with the appraisal at issue, essentially to determine replacement cost and to be their advocate in the appraisal process and to make sure those relevant to the appraisal understood the meaning and application of the term *replacement* cost and to convince those involved in the appraisal of the correctness of his valuation by supporting it with facts and logic." (Original italics.)

Appellants' attorneys selected a retired judge who had never conducted a replacement cost appraisal as an umpire. According to appellants, the umpire

---

[2] Appellants' opening brief purports to quote from their contract with FIE, even though the contract at issue appears nowhere in the record. (Cf. Cal. Rules of Court, rule 8.204(a)(1)(C) [reference must be supported by citation to record].) The appraisal clause they purport to quote is identical to the one mandated by the Insurance Code.

"demonstrated a fundamental misunderstanding" of replacement costs at the beginning of the hearing on the appraisal. According to appellants' complaint, none of the people hired by appellants changed, or even adequately tried to change, the umpire's understanding, even though they had been hired to do so. They likewise failed throughout the appraisal hearing to clarify the meaning of the term "replacement cost." Because the people whom appellants hired failed to adequately define the correct standard of replacement cost for the appraisal, appellants were not awarded proper replacement costs. Appellants allege they were damaged by at least $1.8 million.

Appellants sued respondents Carneghi and Dailey in connection with the allegedly flawed appraisal process.[3] As amended, their complaint alleged a single cause of action for negligence against respondents. Respondents both demurred to the complaint. The trial court sustained both demurrers without leave to amend, and judgments were entered for respondents.[4] This timely appeal followed.

## II.

### DISCUSSION

#### A. *Standard of Review.*

Our standard of review is well established. " 'When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm.

---

[3] Appellants also sued their attorneys and another expert they had hired. Those defendants are not parties to this appeal.

[4] The trial court's orders sustaining respondents' demurrers did not include statements of the specific grounds upon which the orders were based, as required by Code of Civil Procedure section 472d. Appellants argue in passing that the trial court's failure to state reasons for its decisions is reversible error. We disagree. The failure to state the court's reasons " 'must be considered harmless error . . . absent a demonstration of prejudice to plaintiff. [Citation.] The requirement of stated grounds is very useful as a guide when plaintiff wishes and is able to amend the complaint, but on appeal its importance is minimal since the ruling will be upheld on any sufficient ground, whether relied on by the court below or not. [Citation.]' " (*Brown v. State of California* (1993) 21 Cal.App.4th 1500, 1506 [26 Cal.Rptr.2d 687], disapproved on another ground in *Massingill v. Department of Food & Agriculture* (2002) 102 Cal.App.4th 498, 506–507 [125 Cal.Rptr.2d 561].) Moreover, because nothing in the record indicates that appellants notified the trial court of its failure to state reasons (indeed, they did not object at the hearing on the demurrers when Carneghi's counsel asked the court whether his proposed order should be silent as to the grounds for granting the demurrer), appellants waived this requirement. (*Krawitz v. Rusch* (1989) 209 Cal.App.3d 957, 962–963 [257 Cal.Rptr. 610].)

[Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff.' " (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126 [119 Cal.Rptr.2d 709, 45 P.3d 1171], quoting *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

> **B.** *No Error to Sustain Carneghi's Demurrer Without Leave to Amend.*
>
> **1.** *Appraisal procedure is an arbitration.*

In arguing that the trial court should sustain his demurrer without leave to amend, Carneghi argued below that the appraisal process mandated by the Insurance Code and described in appellant's complaint constituted an arbitration, and that he was entitled to arbitral immunity because his role as an appraiser was analogous to that of an arbitrator. In their opposition, appellants essentially conceded that the appraisal process in this case was a form of arbitration, referring to Carneghi as "a party appraiser, or arbitrator." Appellants argued that because Carneghi was alleged to have played a role as a party-appointed advocate, he was not subject to arbitral immunity. The trial court stated at the hearing on the demurrer that Carneghi had prevailed, but left open the question whether it would grant appellants leave to amend. The court ultimately sustained the demurrer without leave to amend.

Appellants' opening brief to this court raises a single argument, not raised below, that the appraisal process set forth in section 2071 is not an "arbitration." Having failed to raise this issue below, they have arguably waived it. (*People ex rel. Dept. of Transportation v. Superior Court* (2003) 105 Cal.App.4th 39, 46 [129 Cal.Rptr.2d 60] [as a general rule, issues not raised in trial court cannot be raised for first time on appeal].)

■ Even assuming the argument was not waived, it clearly lacks merit. It is well settled that "[a]n agreement to conduct an appraisal contained in a policy of insurance constitutes an 'agreement' within the meaning of [Code of Civil Procedure] section 1280, subdivision (a), and therefore is considered to be an arbitration agreement subject to the statutory contractual arbitration law. [Citation.]" (*Louise Gardens of Encino Homeowners' Assn., Inc. v. Truck Ins. Exchange, Inc.* (2000) 82 Cal.App.4th 648, 658 [98 Cal.Rptr.2d 378], fn. omitted [considering award issued after appraisal pursuant to § 2071]; see also *Appalachian Insurance Co. v. Rivcom Corp.* (1982) 130 Cal.App.3d 818, 824 [182 Cal.Rptr. 11] (*Appalachian*) ["As used in the Code of Civil Procedure, an agreement providing for an appraisal [pursuant to section 2071] is included within the concept of agreements to arbitrate."]; Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2006) ¶ 15:356, p. 15-53 [appraisal proceedings are form of arbitration and are subject to

rules governing arbitrations].) As this court recognized more than a decade ago, the appraisal process set forth in section 2071 is "akin to arbitration." (*Gebers v. State Farm General Ins. Co.* (1995) 38 Cal.App.4th 1648, 1650 [45 Cal.Rptr.2d 725].) Although it is true, as appellants argue, that this court did not specifically state that an appraisal is identical to an arbitration, appellants present no compelling argument that the appraisal process in section 2071 is not, in fact, an arbitration.

 Appellants acknowledge that under California's arbitration act, the term " '[a]greement' includes but is not limited to agreements providing for . . . *appraisals* . . . ." (Code Civ. Proc., § 1280, subd. (a), italics added.) The term " 'appraisals' " was added to the arbitration act in 1961 to expressly extend the coverage of the statute to appraisal proceedings. (*Klubnikin v. California Fair Plan Assn.* (1978) 84 Cal.App.3d 393, 397–398 [148 Cal.Rptr. 563].) Appellants argue that although an appraisal is an "agreement," it is not "an agreement to submit to arbitration," which is referenced elsewhere in the arbitration act. (Code Civ. Proc., § 1281 ["A written agreement to submit to arbitration an existing controversy or a controversy thereafter arising is valid, enforceable and irrevocable . . . ."].) What this argument fails to acknowledge is that the term " 'arbitration' " is not itself defined in the arbitration act. (*Cheng-Canindin v. Renaissance Hotel Associates* (1996) 50 Cal.App.4th 676, 684 [57 Cal.Rptr.2d 867].) In determining whether an internal employee review committee procedure was an agreement to arbitrate, our colleagues in Division Two concluded that "although arbitration can take many procedural forms, a dispute resolution procedure is not an arbitration unless there is a third party decision maker, a final and binding decision, and a mechanism to assure a minimum level of impartiality with respect to the rendering of that decision." (*Id.* at pp. 687–688.) In reaching its conclusion, the court pointed to section 2071 and acknowledged that "California case law recognizes that this appraisal provision is an arbitration agreement." (*Cheng-Canindin, supra,* at p. 685.) Although it may be true, as appellants argue, that the Insurance Code does not specifically define an appraisal as an arbitration, appellants simply ignore the fact that a decision from this district has concluded that the appraisal process is an "arbitration." (*Ibid.*)

 Appellants argue that an insurance appraisal is "vastly different" from an arbitration. They point to the fact that the appraisal clause mandated by section 2071 does not specify how an umpire and two appointed appraisers will decide issues where the appraisers fail to reach an agreement, and does not provide for the discovery, testimony, briefing, "or any of the other accouterments that we associate with litigation or with arbitration." Although it is true that "arbitration can take many procedural forms" (*Cheng-Canindin v. Renaissance Hotel Associates, supra,* 50 Cal.App.4th at p. 687), it does not follow that "a fire insurance appraisal is *not* an arbitration" simply because it does not have the "accouterments" that appellants claim are required in order

for a procedure to be considered an arbitration. (Original italics.) This is especially true in light of the fact that California law does not automatically guarantee the right to discovery in arbitration proceedings, except in certain types of cases or unless the parties agree. (Code Civ. Proc., §§ 1283.05, 1283.1, 1282.2, subd. (a)(2); 6 Witkin, Cal. Procedure (4th ed. 1997) Proceedings Without Trial, § 513, p. 952.) Moreover, in general, "appraisal proceedings are subject to the rules governing contractual arbitration proceedings." (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 15:360, p. 15-54.)

We likewise reject appellants' argument, based on *Jefferson Ins. Co. v. Superior Court* (1970) 3 Cal.3d 398 [90 Cal.Rptr. 608, 475 P.2d 880] and *Safeco Ins. Co. v. Sharma* (1984) 160 Cal.App.3d 1060 [207 Cal.Rptr. 104] (*Safeco*), that because appraisers' powers are somewhat different from those of arbitrators in other contexts, that means an appraisal pursuant to section 2071 is not an arbitration. The Supreme Court held in *Jefferson* that the trial court had properly vacated an appraisal award pursuant to section 2071, because the appraisers had based the appraisal award on a misconception of the law. (*Jefferson, supra*, at pp. 400, 403.) The court noted that appraisers generally have more limited powers than those of arbitrators, and the appraisers in *Jefferson* had exceeded those powers when they did more than simply determine the actual cash value of an insured building. (*Id.* at p. 403.) *Safeco* likewise held that appraisers had exceeded their powers by doing more than simply determine the amount of loss. (*Safeco, supra*, at p. 1065.) Just because the role of appraisers may be more limited than that of arbitrators—whose powers may of course always be limited by contract (*Bonshire v. Thompson* (1997) 52 Cal.App.4th 803, 810 [60 Cal.Rptr.2d 716])—that does not make an appraisal any less of an arbitration. In fact, both *Jefferson* and *Safeco* acknowledged the *similarities* between appraisals and arbitrations. (*Jefferson, supra*, at p. 401, fn. 4 [enforcement procedures respecting arbitration are applicable to appraisals]; *Safeco, supra*, at p. 1063 [because of similarity between arbitration and appraisal enforcement proceedings, court applied standard of review applicable to arbitration awards].)[5]

We also reject appellants' unsupported assertion that because appraisers "are not permitted to determine issues of law or coverage, decisions of fire insurance appraisers lack the finality of an arbitrator's award." This claim

---

[5] Appellants claim that *Safeco* applied a scope of review to the arbitration award that differed "significantly" from the scope of review of an arbitration. To the contrary, the court stated: "In view of the *similarity* between arbitration and appraisal enforcement proceedings [citation], we apply to the appraisal proceedings at issue herein the general standard of review applicable to arbitration." (*Safeco, supra*, 160 Cal.App.3d at p. 1063, italics added.) The court examined the record to determine whether the appraisers had exceeded their powers (*id.* at pp. 1063–1064), something the court of course does when determining whether arbitrators have exceeded *their* powers. (*Bonshire v. Thompson, supra*, 52 Cal.App.4th at p. 810.)

of lack of finality is directly contradicted by section 2071, which provides that when an award is submitted to the insurance company, it "shall determine the amount of actual cash value and loss." The parties are then free to confirm the award issued by the panel in the same manner in which an arbitration award is enforced. (E.g., *Jefferson Ins. Co. v. Superior Court, supra,* 3 Cal.3d at p. 401, fn. 4; *Louise Gardens of Encino Homeowners' Assn., Inc. v. Truck Ins. Exchange, Inc., supra,* 82 Cal.App.4th at p. 651.) A confirmed award of appraisers and umpire is treated as a confirmed arbitration award, which has the " 'same force and effect as . . . a judgment in a civil action.' " (*Klubnikin v. California Fair Plan Assn., supra,* 84 Cal.App.3d at p. 398.) Although it is true that a party to a fire insurance contract retains jury trial rights as to other issues, the party "simply has no jury trial right as regards the setting of the dollar amount of the loss under the policy." (*Appalachian, supra,* 130 Cal.App.3d at p. 825.)

Appellants do not dispute the fact that several published appellate decisions have held that an appraisal pursuant to section 2071 is an arbitration, but argue that none of the cases includes "the close reading of the plain words of the [arbitration act] statute" that appellants advocate. For example, appellants attempt to distinguish *Klubnikin v. California Fair Plan Assn., supra,* 84 Cal.App.3d at page 398, which held that a confirmed award of appraisers and an umpire in a fire insurance appraisal shall be treated as a confirmed award in arbitration under California's arbitration statute, by arguing that the court likened an appraisal to arbitration "for that limited purpose." But *Klubnikin*'s holding that a judgment confirming an appraisal award "is not subject to collateral attack except for grounds that would be available to attack any other civil judgment" is directly relevant to this appeal. (*Ibid.*) Having apparently failed to petition the trial court to vacate the appraisal award, appellants may not now collaterally attack the award by suing their appraiser. (*Ibid.*)

Appellants also criticize *Appalachian, supra,* 130 Cal.App.3d 818, which reversed the denial of a petition to compel an appraisal pursuant to section 2071. (*Appalachian,* at pp. 822, 830.) In considering whether an appraisal clause deprives an insured of the right to a jury trial, the court concluded that an agreement providing for an appraisal is included within the concept of agreements to arbitrate (Code Civ. Proc., § 1280, subd. (a)), and noted that the appraisal clauses in fire insurance policies had been enforced for "almost 100 years." (*Appalachian, supra,* at p. 824, citing *Saucelito L. & D. D. Co. v. C. U. A. Co.* (1884) 66 Cal. 253 [5 P. 232].) It cited a 1937 Ninth Circuit case that referred to the appraisal process as a " 'quasi judicial process of arbitration.' " (*Appalachian, supra,* at pp. 824–825, quoting *Hyland v. Millers Nat. Ins. Co.* (9th Cir. 1937) 91 F.2d 735, 737.) Appellants criticize *Appalachian* for relying on *Saucelito,* which predated the statutory procedure at issue, but fail to acknowledge that the predecessor to section 2071 was

adopted in 1909, and was referred to as a "'quasi judicial process of arbitration'" as early as 70 years ago. (*Appalachian, supra,* at pp. 824–825.)

We reject appellants' argument that other cases simply cite *Appalachian, supra,* 130 Cal.App.3d with "a dearth of reasoning or analysis" as to whether the appraisal process in section 2071 is an arbitration. Appellants' argument rests on the mistaken assumption that *Appalachian* reached an "erroneous" conclusion, and that *Appalachian* should have analyzed the difference between an "'agreement[]'" and an "'agreement[] to submit to arbitration.'" As appellants acknowledge, no case supports the interpretation of section 2071 that they advocate. They note that several opinions from the Second District holding that a fire insurance appraisal is an arbitration are not binding on this court. However, given that this court already has stated that the appraisal process pursuant to section 2071 is "akin to arbitration" (*Gebers v. State Farm General Ins. Co., supra,* 38 Cal.App.4th at p. 1650), we find no compelling reason to reject well-established case law holding that a fire insurance appraisal pursuant to section 2071 is an arbitration.

### 2. *Carneghi is protected by arbitral immunity.*

Appellants argue generally that the Legislature "has not provided a shield to those who are hired to do a job for a party to a fire insurance appraisal and through their negligence fail to do it and thereby cause injury to the party employing them." Although they acknowledge that Carneghi argued below that he had arbitral immunity, they do not specifically address this issue in their opening brief, other than to say that "[t]he arbitral immunity [Carneghi] argued was based on the notion that [appellants'] suit against them, based upon their misconduct in the appraisal process, was really complaining about their actions in an arbitration. . . . Since an appraisal does not constitute an arbitration, [Carneghi is] not immune to suit." Having failed to address the issue of arbitral immunity in their opening brief, they have arguably waived it. (*In re Marriage of Sheldon* (1981) 124 Cal.App.3d 371, 381 [177 Cal.Rptr. 380] [well settled that appellate court may consider as waived any issue not raised in appellant's opening brief].)

█ Even assuming the issue was not waived, it clearly lacks merit. "It long has been recognized that, in private arbitration proceedings, an arbitrator enjoys the benefit of an arbitral privilege because the role that he or she exercises is analogous to that of a judge. [Citation.] This rule—immunizing arbitrators in private contractual arbitration proceedings from tort liability—is well established in California. [Citations.]" (*Moore v. Conliffe, supra,* 7 Cal.4th at p. 650 [witness who testifies at deposition in private, contractual arbitration proceeding protected by litigation privilege].) "'"Arbitrators are judges

chosen by the parties to decide the matters submitted to them . . . ." . . . Arbitrators have been extended the protection of judicial immunity, because they perform " 'the function of resolving disputes between parties, or of authoritatively adjudicating private rights.' " ' " (*Stasz v. Schwab* (2004) 121 Cal.App.4th 420, 430 [17 Cal.Rptr.3d 116].) Although we agree with appellants that no case has specifically extended arbitral immunity to appraisers, we disagree with appellants' assertion that any analysis of arbitral immunity is "wide of the mark," given the similarities between arbitrations and appraisals pursuant to section 2071.

*Coopers & Lybrand v. Superior Court* (1989) 212 Cal.App.3d 524 [260 Cal.Rptr. 713] (*Coopers*) is not to the contrary, as appellants argue. *Coopers* considered whether the trial court erred in overruling defendants' demurrer, based on the fact that the auditor in a binding audit had arbitral immunity. (*Id.* at p. 527.) The court interpreted Code of Civil Procedure former section 1280.1[6] as "conferring full arbitral immunity upon arbitrators in *appraisals*, valuations and similar proceedings, such as audits, irrespective of the arbitrator's particular role in a given situation." (*Coopers, supra,* at p. 536, italics added.) The court rejected the argument that an arbitrator's misconduct or fraud cuts off arbitral immunity, holding that "[t]he remedy for arbitrator misconduct lies in vacation of the award under [Code of Civil Procedure] section 1286.2." (*Ibid.*) The court nonetheless held that the specific agreement for a binding valuation at issue was not per se an agreement for arbitration, and that "[s]omething more" was required to show that it was an arbitration. (*Id.* at pp. 537, 540.) Here, by contrast, it is well settled that an appraisal pursuant to section 2071 is an arbitration as a matter of law. (Cf. *Coopers, supra,* at pp. 537, 540.)

 Appellants argue for the first time in their reply brief that the duties of party appraisers are analogous to those of lawyers, and that appraisers therefore should not be subject to arbitral immunity. Appellants cite no authority for their claims that, for example, appraisers "advocate their appraisals to the umpire just as lawyers advocate their client's positions before a judge," or that it is their duty to "write appraisals and present them to the other side's appraiser, argue his or her positions and, failing to convince the other party-appraiser and reach agreement on them, to argue those positions on those appraisals as to which there is disagreement to the umpire who makes the decision." The comparison of appraisers to lawyers is contrary to the holding in *Klubnikin v. California Fair Plan Assn., supra,* 84 Cal.App.3d at page 395, that " 'appraisers' empowered by the terms of a

---

[6] This statute, which provided arbitral immunity to judicial officers when acting in the capacity of arbitrator under any statute or contract, was repealed by its own terms on January 1, 1997. (Stats. 1985, ch. 709, § 1, p. 2341; Stats. 1995, ch. 209, § 2, p. 749.) The repeal did not affect common law, which recognizes arbitral immunity. (*Stasz v. Schwab, supra,* 121 Cal.App.4th at pp. 434–436.)

policy of fire insurance to determine the 'cash value' and 'loss' utilized to ascertain the amount payable on the policy are arbitrators within the meaning of Code of Civil Procedure section 1280 . . . ."

In fact, this court's opinion in *Gebers v. State Farm General Ins. Co., supra,* 38 Cal.App.4th 1648, analogized the role of an appraiser to that of an arbitrator. The court held that an insurance company was not permitted to alter a fire insurance policy to describe appraisers as " 'independent' " (and therefore potentially biased toward a party) in light of the requirement in section 2071 that an appraiser be " 'disinterested.' " (*Gebers, supra,* at pp. 1649–1650.) The court noted that the entire appraisal panel (the umpire and both party-selected appraisers) is held to a higher standard of impartiality than are arbitrators generally, because the Legislature has mandated appraiser impartiality. (*Id.* at pp. 1652–1653.) Because the appraiser selected by the insurance company in *Gebers* had a direct pecuniary interest in ongoing litigation work with the company and was therefore presumably biased, the court vacated the underlying award issued by the arbitration panel. (*Id.* at pp. 1650, 1652–1653, citing Code Civ. Proc., § 1286.2 [award must be vacated if there was corruption in any of the arbitrators].) Given the fact that this court has held that the Legislature has "made appraiser impartiality a statutory requirement" (*Gebers, supra,* at p. 1653), we disagree with appellants' unsupported assertion that "the party appraiser's duties are more like the duties of an attorney."

Appellants also argue, again for the first time in their reply brief, that even if Carneghi was considered an arbitrator, the "vast differences in both the ethics and duties of a party-arbitrator and a true neutral arbitrator" compel a finding that Carneghi was not subject to arbitral immunity. Appellants rely on a Seventh Circuit case interpreting the Federal Arbitration Act, a New York appellate court case, and a provision in the American Arbitration Association's Code of Ethics for Arbitrators in Commercial Disputes, canon X (eff. Mar. 1, 2004). (*Sphere Drake Ins. v. All American Life Ins.* (7th Cir. 2002) 307 F.3d 617, 620 [party-appointed arbitrator on a tripartite panel is supposed to be an advocate]; *Mtr. of Astoria Med. Group (Health Ins.)* (1962) 11 N.Y.2d 128 [227 N.Y.S.2d 401, 182 N.E.2d 85, 87] [party-designated arbitrators are not neutral in the sense that neutral arbitrator or judge is]; Am. Arb. Assn., *supra,* canon X [ethical standards for party-appointed arbitrators].) Having failed to raise this argument with the trial court or in their opening brief, appellants have "doubly waived" the argument. (*Heiner v. Kmart Corp.* (2000) 84 Cal.App.4th 335, 351 [100 Cal.Rptr.2d 854].) We note that appraisers appointed under the statutory scheme at issue here "must make the same disclosures to the parties as are required of *neutral arbitrators* generally." (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶ 15:364, p. 15-55, italics added.) In any event, we disagree that "it would be nonsense" to provide arbitral immunity to party-appointed appraisers, because

of whatever difference exists in the role played by a party-appointed appraiser (as opposed to an "umpire"). We see no reason why an appraiser who is required by statute to be "disinterested" (§ 2071) should be subject to tort liability in connection with his role as an appraiser, given this state's preference to provide immunity to those who perform the function of resolving disputes between parties. (*Stasz v. Schwab, supra,* 121 Cal.App.4th at p. 430.)

We also find unpersuasive the Canadian case that appellants cite in their reply brief. (*Ivarson v. Lloyd's Underwriters,* Kelowna No. 39922 [2002] B.C.J. 2646, 2002 BCSC 1627 [2002 BC.C. Lexis 5197].) First, we are of course not bound by a decision from a court in British Columbia, which obviously did not analyze California's Insurance Code. Second, the court in *Ivarson* did not hold, as appellants claim, that an appraiser is not subject to arbitral immunity. The court specifically stated that "[i]t may be that an appraiser *does enjoy immunity* against a claim for damages in negligence or breach of contract for his or her actions in an appraisal process," but that summary dismissal was inappropriate on the record before it. (*Ibid.*, italics added.)

Appellants argue, once again for the first time in their reply brief, that because the appraisal proceeding at issue was "an atypical anomaly among appraisals, setting the precedent of immunity for all appraisers based upon the record in this case would be very unwise." (Capitalization omitted.) They claim, without citation to any source whatsoever, that it is "rare" for an umpire to be selected in a fire insurance appraisal, and that almost no appraisals involve a hearing. Even assuming arguendo that those unsupported facts are true, it does not follow that an appraiser should not be subject to arbitral immunity. Appellants claim that providing arbitral immunity to appraisers "could lead to unintended [and] disastrous results," because arbitrators may escape liability when they ignore "irrefutable proof" that supports a party's position. "The remedy for arbitrator misconduct lies in vacation of the award under [Code of Civil Procedure] section 1286.2." (*Coopers, supra,* 212 Cal.App.3d at p. 536; see also *Klubnikin v. California Fair Plan Assn., supra,* 84 Cal.App.3d at p. 398.) Appellants were of course free to petition the trial court pursuant to the Arbitration Act to vacate the appraisal award. (E.g., *Jefferson Ins. Co. v. Superior Court, supra,* 3 Cal.3d at p. 401; *Gebers v. State Farm General Ins. Co., supra,* 38 Cal.App.4th at p. 1650.) Again, having failed to do so, they may not now collaterally attack the award by suing an appraiser for any alleged acts or omissions in the appraisal process.

Finally, as respondent Carneghi correctly notes, appellants did not seek leave from the trial court to amend their complaint, and they do not argue on appeal that the trial court abused its discretion in sustaining Carneghi's

demurrer without leave to amend. Although appellants were not required to request below to amend their pleading in order to raise the issue on appeal (Code Civ. Proc., § 472c, subd. (a)), they have not presented any reason that they should have been granted leave to amend their complaint, and our review has revealed none. The trial court did not err in sustaining Carneghi's demurrer without leave to amend.

### C. *Sustaining Dailey's Demurrer Was Error.*

In arguing that the trial court should sustain his demurrer without leave to amend, respondent Dailey argued below that his expert testimony was protected by the litigation privilege. (Civ. Code, § 47, subd. (b).) In their opposition, appellants argued that the litigation privilege protects only experts of a party opponent, not experts hired by a plaintiff. They relied on *Mattco Forge, Inc. v. Arthur Young & Co.* (1992) 5 Cal.App.4th 392 [6 Cal.Rptr.2d 781] (*Mattco*), which held that the litigation privilege does not protect a negligent expert witness from liability to the party who hired him. At the hearing on Dailey's demurrer, the trial court stated that it was inclined to overrule the demurrer. The trial court did not rule on the demurrer at the hearing (as it had done with Carneghi's demurrer), but ultimately sustained Dailey's demurrer without leave to amend. Appellants contend that the trial court erred by sustaining Dailey's demurrer.

Appellants first argue that because the appraisal proceeding did not constitute an arbitration, the litigation privilege did not apply.[7] We have already rejected appellants' argument that the appraisal proceeding did not constitute an arbitration. Additionally, appellants again argue on appeal, relying on *Mattco, supra,* 5 Cal.App.4th 392, that the litigation privilege does not apply where a plaintiff sues his own expert for negligence. This contention has merit.

Civil Code section 47, subdivision (b) provides that a privileged publication is one made "[i]n any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable pursuant to Chapter 2 (commencing with Section 1084) of Title 1 of Part 3 of the Code of Civil Procedure," with exceptions not relevant here.

---

[7] In fact, this is the only argument they raised in their opening brief, and they did not address the application of the litigation privilege until their reply to Dailey's brief. They claim that they did not address the litigation privilege sooner "because they believe that the difference between an appraisal and an arbitration is sufficiently clear so as to make the extension of either of the drastic shields of arbitral immunity or the litigation privilege to an appraiser in an appraisal so wholly inappropriate and unjustified as to merit no finer a point or further discussion." We disagree with appellants' analysis, but nonetheless provided Dailey the opportunity to brief the issue pursuant to Government Code section 68081.

■ "Several policies underlie the privilege. First, it affords litigants free access to the courts to secure and defend their rights without fear of harassment by later suits. Second, the courts rely on the privilege to prevent the proliferation of lawsuits after the first one is resolved. Third, the privilege facilitates crucial functions of the trier of fact." (*Mattco, supra*, 5 Cal.App.4th at p. 402.) "[I]n immunizing participants from liability for torts arising from communications made during judicial proceedings, the law places upon litigants the burden of exposing during trial the bias of witnesses and the falsity of evidence, thereby enhancing the finality of judgments and avoiding an unending roundelay of litigation, an evil far worse than an occasional unfair result." (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 214 [266 Cal.Rptr. 638, 786 P.2d 365].)

"The statutory privilege protects attorneys, judges, jurors, witnesses, and other court personnel from liability arising from publications made during a judicial proceeding. [Citation.] Although originally enacted in the context of defamation actions, the privilege now applies to 'any communication, whether or not it amounts to a publication [citations], and all torts except malicious prosecution. [Citations.] Further, it applies to any publication required or permitted by law in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made outside the courtroom and no function of the court or its officers is involved. [Citations.]' " (*Mattco, supra*, 5 Cal.App.4th at p. 402.)

■ "The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." (*Silberg v. Anderson, supra*, 50 Cal.3d at p. 212.) "The litigation privilege is broadly applied [citation] and doubts are resolved in favor of the privilege [citation]." (*Ramalingam v. Thompson* (2007) 151 Cal.App.4th 491, 500 [60 Cal.Rptr.3d 11].) The privilege protects statements made in private, contractual arbitration proceedings in order to encourage witnesses to provide open and candid testimony. (*Moore v. Conliffe, supra*, 7 Cal.4th at p. 649.) It has been used to protect the expert witness of a party opponent (*id.* at pp. 637–639), as well as experts jointly hired by parties (e.g., *Ramalingam v. Thompson, supra*, 151 Cal.App.4th at p. 494; *Gootee v. Lightner* (1990) 224 Cal.App.3d 587, 589 [274 Cal.Rptr. 697]).

The court in *Mattco* held that the litigation privilege does not bar a plaintiff's lawsuit against an expert witness hired by the plaintiff to assist him in litigation. (*Mattco, supra*, 5 Cal.App.4th at p. 406.) Mattco Forge, Inc. (Mattco), hired an accounting firm to provide litigation support in a federal action against an electric company, including calculating and testifying about

profits Mattco allegedly lost because of the electric company's conduct. (*Id.* at pp. 396, 399.) To calculate estimated lost profits, Mattco recreated estimate sheets and gave them to its accountants. (*Id.* at p. 397.) The federal district court held that Mattco created and produced fraudulent documents, with an intent to deceive its party opponent and the court. (*Ibid.*) The court ruled that Mattco had engaged in fraudulent conduct, and ordered the company to pay the defendant electric company $1.4 million in sanctions or have its case dismissed. (*Ibid.*) The accounting firm never participated in the federal court proceedings. (*Id.* at p. 398.) Mattco later sued the firm, alleging professional malpractice and other torts. (*Id.* at pp. 395–396.)

The *Mattco* court reversed a grant of summary judgment, finding that the litigation privilege did not bar the lawsuit against the accounting firm. (*Mattco*, *supra*, 5 Cal.App.4th at p. 406.) The court concluded that although the privilege bars suits against the expert witness of a party opponent, and against an expert jointly retained by the parties, it does not protect one's own expert witnesses. (*Id.* at pp. 404–405.) The court explained, "In such a situation, policy considerations that would usually favor the privilege here argue against applying it." (*Id.* at p. 404.) Distinguishing cases holding the privilege applies to jointly retained experts, the court stated, " 'Freedom of access to the courts and encouragement of witnesses to testify truthfully will be harmed if *neutral* experts must fear retaliatory lawsuits from litigants whose disagreement with an expert's opinions perforce convinces them the expert must have been negligent in forming such opinions.' (*Gootee* v. *Lightner*, *supra*, 224 Cal.App.3d at p. 593.)" (*Id.* at p. 404, italics added.) In both *Mattco* and the present case, the expert witness being sued was not a neutral expert, but rather was retained by the party suing him. The *Mattco* court concluded that none of the cases that have applied the litigation privilege to jointly retained experts "provides a precedent for applying the statutory privilege to protect a 'friendly' expert witness." (*Id.* at p. 405.)

The *Mattco* court discussed at length one case, which did apply the litigation privilege to a "friendly" expert, the Washington State Supreme Court decision in *Bruce v. Byrne-Stevens & Assocs.* (1989) 113 Wn.2d 123 [776 P.2d 666] (*Bruce*). After noting that *Bruce* is not controlling precedent in California and that it relied on the common law immunity of parties and witnesses (not on a statute, as in California), the *Mattco* court emphasized that the suit in *Bruce* followed the expert's trial testimony, while the suit in *Mattco* never proceeded to trial. "If an expert witness's negligence and breach of contract cause dismissal of the party who hired that expert witness, that does not expand freedom of access to the courts. Applying the privilege in this circumstance does not encourage witnesses to testify truthfully; indeed, by shielding a negligent expert witness from liability, it has the opposite effect. Applying the privilege where the underlying suit never reached the trial stage would also mean that the party hiring the expert

witness would have to bear the penalty for the expert witness's negligence. That result would scarcely encourage the future presentation of truthful testimony by that witness to the trier of fact." (*Mattco, supra,* 5 Cal.App.4th at p. 404.)

The *Mattco* court further noted that the policy of placing " 'upon litigants the burden of exposing during trial the bias of witnesses and the falsity of evidence, thereby enhancing the finality of judgments and avoiding an unending roundelay of litigation' " did not logically apply in a "pretrial dispute between a party and its own expert witness that arose during discovery." (*Mattco, supra,* 5 Cal.App.4th at p. 406.) In the present case, appellants' complaint primarily focused on Dailey's testimony at the appraisal proceeding at issue. Appellants alleged that they hired Dailey to "define, describe and estimate the replacement cost" of their home, and that Dailey was negligent in failing to correct the umpire's "fundamental misunderstanding" of the term "replacement cost."[8] (Italics omitted.)

Appellants argue that *Mattco* was not limited in its application to those cases where the expert does not testify, and that it held generally that the policies underlying the litigation privilege *never* apply where a party sues his own expert. Subsequent California appellate cases have cited *Mattco* with approval, without necessarily limiting its application to cases where the expert does not testify. (*Kolar v. Donahue, McIntosh & Hammerton* (2006) 145 Cal.App.4th 1532, 1541 [52 Cal.Rptr.3d 712] [*Mattco, supra,* 5 Cal.App.4th 392, "considered whether the litigation privilege protected an expert witness who was sued for malpractice by his client based on the expert's testimony at trial" and held that the privilege did not apply; key purpose of promoting freedom of access to courts and encouraging truthful testimony without fear of retaliatory lawsuits not furthered by shielding

---

[8] Although not specifically addressed in *Mattco, supra,* 5 Cal.App.4th, 392, the litigation privilege protects only "communicative" conduct, as opposed to noncommunicative acts. (*Jacob B. v. County of Shasta* (2007) 40 Cal.4th 948, 956–957 [56 Cal.Rptr.3d 477, 154 P.3d 1003] [litigation privilege protects letter written in connection with family law proceeding]; *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1058 [39 Cal.Rptr.3d 516, 128 P.3d 713] [privilege protects actions taken to collect a judgment]; *Kimmel v. Goland* (1990) 51 Cal.3d 202, 211 [271 Cal.Rptr. 191, 793 P.2d 524] [privilege does not protect noncommunicative act of unlawfully tape-recording conversation in preparation for litigation]; *Ramalingam v. Thompson, supra,* 151 Cal.App.4th at p. 503 [malpractice action based on communication of expert opinion barred by litigation privilege].) "[T]he key in determining whether the [litigation] privilege applies is whether the injury allegedly resulted from an act that was communicative in its essential nature." (*Rusheen v. Cohen, supra,* 37 Cal.4th at p. 1058.) Here the allegations of appellant's complaint focused primarily on Dailey's alleged failure to explain the "correct" meaning of "replacement cost" at the appraisal hearing. The gravamen of his complaint is thus clearly communicative conduct. The complaint also includes allegations regarding Dailey's negligence in prelitigation activities. However, preparatory activity leading to a witness's testimony is protected by the litigation privilege, to the extent that it otherwise applies. (*Gootee v. Lightner, supra,* 224 Cal.App.3d at pp. 593–594.)

expert from malpractice suit by own client]; *Wentland v. Wass* (2005) 126 Cal.App.4th 1484, 1493 [25 Cal.Rptr.3d 109] [*Mattco* found policies underlying litigation privilege not furthered in suit in contract and tort against expert hired to assist hiring party; encouraging expert to testify truthfully advanced only by shielding neutral or adverse experts from liability]; *Ramalingam v. Thompson, supra,* 151 Cal.App.4th at p. 501 ["where a party brought an accounting malpractice action against its own allegedly negligent experts, it was held that the litigation privilege did not apply. . . . '[T]he litigation privilege does not exist to protect one's own expert witness, but to protect adverse witnesses from suit by opposing parties . . .' " (citation omitted)], citing *Mattco, supra,* 5 Cal.App.4th at pp. 395, 405.)

Additionally, as appellants note, the majority of out-of-state cases addressing the issue of the applicability of the litigation privilege to a party's own witness have reached a similar conclusion. (*Pollock v. Panjabi* (2000) 47 Conn.Supp. 179 [781 A.2d 518] [policy upon which witness immunity in Connecticut based—having witnesses speak freely—not implicated in suit against party's own expert]; *Boyes-Bogie v. Horvitz & Associates* (2001) 14 Mass.L.Rptr. 208 [2001 Mass.Super. Lexis 582] [doctrine of witness immunity does not bar claim for negligence against expert retained to provide litigation support services by retaining party]; *LLMD of Michigan Inc. v. Jackson-Cross* (1999) 559 Pa. 297 [740 A.2d 186] [doctrine of "witness immunity" does not bar professional malpractice action by party who hired expert]; *Murphy v. A. A. Mathews* (Mo. 1992) 841 S.W.2d 671 [witness immunity not applicable to "litigation support services"; court declines to reach applicability to actual testimony of expert]; *Levine v. Wiss & Co.* (1984) 97 N.J. 242 [478 A.2d 397] [court-appointed accountants not immune from suit]; *Marrogi v. Howard* (La. 2002) 805 So.2d 1118 [expert who provided pretrial analysis and litigation support services not immune from suit merely because he or she provides testimony]; *James v. Brown* (Tex. 1982) 637 S.W.2d 914 [negligent diagnoses may be actionable despite reports to probate judge being privileged].) Two out-of-state cases have, however, reached a contrary conclusion. (*Bruce, supra,* 776 P.2d 666 [expert witness who testified for party immune from suit by that party]; *Panitz v. Behrend* (1993) 429 Pa.Super. 273 [632 A.2d 562] [expert medical witnesses have absolute immunity for testimony given, even if adverse to party hiring them].) Although policy arguments may be made on both sides, we believe that the majority view is the better reasoned approach to this issue.

As the court in *Boyes-Bogie, supra,* 14 Mass.L.Rptr. 208 [2001 Mass.Super. Lexis 582], explained, "In *Bruce v. Byrne-Stevens & Assocs. Eng'rs, Inc.* [citation] a plurality of the Washington Supreme Court held that witness immunity barred a malpractice suit by plaintiffs against an expert they had retained to calculate the costs of corrective work. . . . [¶] The plurality in *Bruce* focused on the chilling effect that the threat of subsequent litigation

would have on the expert's testimony. . . . [A] loss of objectivity would result because experts would be encouraged to assert the most extreme position favorable to the party for whom they testify. [Citation.] Moreover, imposition of civil liability on expert witnesses would discourage anyone who is not a professional expert witness from testifying because only professional witnesses will be in a position to carry insurance covering such liability." (*Id.* at p. 209.) The *Boyes-Bogie* court was not persuaded by the first argument, and although the second caused it greater concern, it ultimately disagreed with the *Bruce, supra*, 776 P.2d 666 conclusion, stating, "Like other courts which have considered the issue, I do not agree with the reasoning of the plurality in *Bruce* that the prospect of civil liability . . . will discourage frank and objective testimony by experts. First, it ignores the reality that, by definition, expert witnesses retained by a party are not objective witnesses. . . . Moreover, the existence of liability will . . . encourage experts to be more careful and thorough resulting in more accurate, reliable testimony. . . . [¶] The second factor relied on by the plurality in *Bruce* . . . is more troublesome. . . . Although this issue could presumably be addressed by contract, the prospect of liability may well hamper the ability of the parties to secure the litigation services of an expert who does not derive a significant portion of his income from providing such services." (*Id.* at pp. 209–210.) The *Boyes-Bogie* court balanced this concern against the fact that witness immunity is " 'an exception to the general rules of liability . . .' " and against the fact that the negligent expert would enjoy immunity at the expense of the right of the party who hired and paid him to obtain competent performance, and ultimately concluded that witness immunity does not bar a claim for negligence against an expert by the party who retained him. (*Ibid.*) We agree.

 Like the court in *Boyes-Bogie, supra*, 14 Mass.L.Rptr. 208 [2001 Mass.Super. Lexis 582], we have considered the policy reasons behind the litigation privilege and their applicability if the privilege is applied to a party's own expert witness. First, it is argued that application of the privilege would promote truthful testimony. As noted in *Boyes-Bogie*, this ignores the reality that an expert retained by one party is not an unbiased witness to begin with, and that the threat of liability for negligence may actually *encourage* more careful and reliable evaluation of the case by the expert. The threat of a charge of perjury, argued by proponents of the application of the privilege to be an alternative deterrent to untruthful testimony, may not be sufficient. Perjury requires that the witness willfully state as true a material matter which he knows to be false. (E.g., *Chein v. Shumsky* (9th Cir. 2004) 373 F.3d 978.) Claims of negligence by an expert witness may be based, in many cases, on qualitative differences of opinion. The fact that the party who hired the expert disagrees with his opinion, that other experts disagree with it, or even that the expert in question later changes his mind, does not suffice to

prove an allegation of perjury. As the California Supreme Court has explained, "opinion testimony does not constitute perjury merely because the witness later changes his or her opinion, nor does it constitute perjury merely because the initial opinion later proves to be 'incorrect.' Testimony is perjured only if the witness does not honestly hold the opinion to which he or she testifies." (*In re Robbins* (1998) 18 Cal.4th 770, 800–801, fn. 24 [77 Cal.Rptr.2d 153, 959 P.2d 311].) In fact, the court in *Robbins* noted that even if the expert later indicated "that he felt unqualified, uncomfortable, and pressured into testifying, this does not in itself suggest, much less does it demonstrate, that his trial testimony was in any way 'false' or that he committed perjury . . . ." (*Ibid.*) Thus, a charge of perjury based upon an expert's opinion is quite difficult to prove. Since a criminal charge of perjury has to be proven beyond a reasonable doubt, and must be established either by testimony of two witnesses or one witness and corroborating circumstances (Pen. Code, § 118, subd. (b); *People v. Trotter* (1999) 71 Cal.App.4th 436 [83 Cal.Rptr.2d 753]; *People v. Di Giacomo* (1961) 193 Cal.App.2d 688 [14 Cal.Rptr. 574]), a party might find it quite difficult to convince a prosecutor to file a perjury charge based upon an expert's stated opinion.[9] Further, professional experts derive a substantial portion of their income from this line of work, and their reputation for honesty and integrity would logically impact the frequency of their future retention as expert witnesses. Their financial stake in their reputation would arguably, therefore, outweigh their interest in shading their testimony in order to avoid a subsequent lawsuit by one individual party who has retained them.

Another policy favoring application of the litigation privilege is the need to promote finality of judgments by discouraging endless collateral litigation. The litigation privilege does not, however, prevent attorneys from being subject to malpractice claims by their former clients, based upon the attorney's alleged negligent representation, for " 'if it also protected an attorney from any suit by a former client, no malpractice suit could be brought.' [Citation.]" (*Kolar v. Donahue McIntosh & Hammerton, supra,* 145 Cal.App.4th at p. 1541, italics omitted; see *Mattco, supra,* 5 Cal.App.4th at p. 406.) If an expert chosen by a party's attorney is negligent, one might surmise that the dissatisfied client will sue his attorney (especially if the party is prevented from suing the expert due to the application of the litigation privilege), leading to collateral litigation in any event. Further, we see no reason why the attorney should be liable for choosing the allegedly negligent expert, while the expert himself would be protected from liability by application of the litigation privilege. If the litigation privilege were to apply to an expert retained by the party attempting to sue him, the party's attorney would

---

[9] There is no civil cause of action for perjury; it is a criminal wrong only. (*Pollock v. University of Southern California* (2003) 112 Cal.App.4th 1416, 1429 [6 Cal.Rptr.3d 122].)

potentially bear the entire financial responsibility for the expert's negligence and yet the most culpable party, the expert, would totally escape accountability.

It is also argued that fewer experts would be willing to become involved in litigation if they could later be sued by the party who retained them. We doubt that disallowing the application of the litigation privilege in this situation would substantially impact the number of experts willing to testify in court cases. *Boyes-Bogie, supra,* 14 Mass.L.Rptr. 208 [2001 Mass.Super. Lexis 582], discusses this issue, both as to expert witnesses who derive the majority of their income from litigation work ("professional expert witnesses") and as to nonprofessional expert witnesses. First, the professional expert witness industry, undeniably a large part of our court system, could lessen the potential financial impact of future suits by the party retaining them. Individuals who testify as professional experts can obtain liability insurance to cover such potential liability; the cost of such insurance could be passed along to the client. If the expert is not a professional one who derives most of his income from litigation-related work, the issue of potential liability of the expert for negligence could certainly be addressed contractually.

Finally, we are not concerned that our refusal to extend the litigation privilege to a party's own expert will negatively impact the integrity of the judicial process. Again, experts retained by a party are partisan witnesses, and we fail to see how permitting them to be sued would undermine the judicial process any more than permitting attorneys to be sued by their own clients. In this regard, an individually retained expert must be distinguished from a jointly retained, or court-appointed, expert. The litigation privilege has been held to apply to jointly retained or court-appointed experts. (E.g., *Ramalingam v. Thompson, supra,* 151 Cal.App.4th at p. 494; *Gootee v. Lightner, supra,* 224 Cal.App.3d at p. 589.) These neutral experts, whose testimony and opinions are intended to assist the trier of fact rather than to advocate a position for a party, are arguably an integral part of the judicial process. We view their role in the judicial system as distinct from that of a partisan expert retained by an individual party and conclude that permitting individually and privately retained expert witnesses to be sued for their negligence will not undermine the judicial process.

For all these reasons, we hold that the litigation privilege does not apply to prevent a party from suing his own expert witness, even if that suit is based upon the expert's testimony.[10]

---

[10] Our decision that appellant's claim against respondent Dailey is not barred by the litigation privilege is consistent with a later ruling by the trial court as to another defendant in this action. Appellants originally sued another expert, who demurred to the complaint several months after appellants filed their notice of appeal challenging the sustaining of respondents'

## III.

### DISPOSITION

The judgment is reversed to the extent the trial court sustained respondent Dailey's demurrer. In all other respects the judgment is affirmed. The cause is remanded to the trial court for further proceedings consistent with this opinion. Each party shall bear its own costs on appeal.

Ruvolo, P. J., and Rivera, J., concurred.

The petition of appellants and respondent Robert Dailey for review by the Supreme Court was denied April 23, 2008, S160995. George, C. J., did not participate therein.

---

demurrers. In its order overruling that defendant's demurrer, the trial court stated, "Acknowledge prior ruling to contrary but upon reflection believe this is correct reading of *Mattco*." Appellants have filed a motion to augment the record on appeal with the moving and opposition papers filed in the trial court, as well as the trial court's order as to the other defendant. "Augmentation does not function to supplement the record with materials not before the trial court . . . ," and a reviewing court considers only matters which were part of the record at the time the judgment was entered. (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3 [58 Cal.Rptr.2d 899, 926 P.2d 1085].) We may, however, take judicial notice of the court records of any court of this state. (Evid. Code, §§ 452, subd. (d), 459, subd. (a); *In re Karen G.* (2004) 121 Cal.App.4th 1384, 1390 [18 Cal.Rptr.3d 301] [appellate court may take judicial notice of subsequent minute order in juvenile court].) We construe appellants' request to augment the record as a request for judicial notice, and hereby grant the request.