Filed 1/30/15  In re Elizabeth U. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re ELIZABETH U., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D066558 |
| Plaintiff and Respondent, | (Super. Ct. No. J518337) |
| v. | |
| KELLY U., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Carol Isackson, Judge.  Affirmed.

Monica Vogelmann, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

Patricia K. Saucier, under appointment by the Court of Appeal, for Minor.

Kelly U. appeals the juvenile court's issuance of a restraining order under Welfare and Institutions Code section 213.5,[1] which prohibits her from having any contact with her 17-year-old daughter, Elizabeth U., for a three-year period. She contends sufficient evidence does not support the juvenile court's issuance of the restraining order in the first instance, or that continued visitation would be detrimental to Elizabeth. The San Diego County Health and Human Services Agency (Agency) contends we should dismiss Kelly's appeal as moot because the juvenile court, based on the parties' stipulation, modified the order once to allow contact on four occasions in November and December 2014.

We conclude the appeal is not moot. We further conclude substantial evidence supports the juvenile court's issuance of the restraining order and its finding that visits would be detrimental to Elizabeth. Accordingly, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Jurisdiction*

Elizabeth was treated at a hospital emergency room on January 25, 2012, after sustaining a golf ball-sized knot on her forehead. She and Kelly had been arguing, when Kelly threw a three-inch-thick candle at Elizabeth's head. During the argument, Kelly told Elizabeth, "[i]f you make me late for school and I miss out on my money I will kill you and myself and I don't care if I go to jail." Kelly also told Elizabeth, "I wish you

---

[1] All further statutory references are to the Welfare and Institutions Code.

2

would have died instead of Lance." Lance was Kelly's other child, who had died just a few months earlier at the age of 12 from complications caused by diabetes. Kelly had a history of mental instability, drug use, and aggressive behavior. She previously had been arrested for domestic violence, which included physical altercations with her sister and inflicting corporal injury on a spouse. She had also been hospitalized for suicidal thoughts and anger problems. Elizabeth was taken into protective custody.

Two days later, the Agency filed a petition on Elizabeth's behalf, alleging she came within the court's jurisdiction under section 300, subdivisions (a) and (b), based on the candle incident and Kelly's histories of mental illness and drug use. Elizabeth wished to reunify with Kelly in the future, but wanted to remain in out-of-home care while Kelly participated in reunification services. Elizabeth would not feel safe in Kelly's care until she got help for her drug problem, stabilized her mental health, and stopped hitting her.

Although she was normally a good student, Elizabeth's grades declined because of the issues at home and her brother's illness and death. She disclosed having a personal anger problem of her own, which began four years earlier when her father, David A., left the home after sexually molesting Elizabeth.[2]

Kelly disclosed she had been diagnosed with anxiety and agoraphobia. She denied having ever been hospitalized for mental health issues, but acknowledged police took her to a hospital for assessment in 2011 after police were informed she was being " 'challenging' towards school staff." She claimed to have "already tried 22 psychotropic

---

[2] David is not a party to this appeal. We mention him only as relevant to Kelly's appeal.

3

meds and that they don't seem to help her," so she occasionally self-medicated with marijuana and crystal methamphetamine. Kelly was attempting to get social security income disability benefits because of her anxiety.

In March 2012, the juvenile court sustained the petition, declared Elizabeth a dependent, and ordered her placed in the home of a nonrelative extended family member.[3] The court ordered the Agency to provide reunification services to Kelly.

*Six-Month Review*

The Agency's six-month review report recommended Elizabeth remain in out-of-home care while Kelly participated in another six months of reunification services. Kelly was unemployed and her housing was unstable. She had participated in supervised visits but had not complied with the other components of her case plan. Her interactions with Agency staff were aggressive and inappropriate—she yelled, invaded personal space, and touched social workers—leading the Agency to restrict communications with her to mail and telephone. Even then, Kelly was hostile and repeatedly hung up on Agency staff.

Elizabeth's grades had improved and she made progress in individual therapy. Her psychiatrist placed her on psychotropic drugs for depression, sleeping issues, and loss of appetite. The medications worked well for Elizabeth.

Supervised visits between Kelly and Elizabeth "varied between acceptable and very poor." During visits early in the review period, Kelly disregarded the caregiver's

---

3    "A 'nonrelative extended family member' is defined as an adult caregiver who has an established familial relationship with a relative of the child . . . or a familial or mentoring relationship with the child." (§ 362.7.)

4

rules, disrespected and threatened the caregiver, made inappropriate comments to Elizabeth about the case, and told Elizabeth that her (Kelly's) new boyfriend's children were Kelly's "new little [Elizabeth] and Lance." Kelly was disruptive during one of Elizabeth's school events, causing a scene that humiliated Elizabeth. Someone called the police, but Kelly left before they arrived. Kelly was also disruptive during church services attended by Elizabeth and her caregiver. Consequently, the Agency required future visits be supervised at a family visitation center instead of by Elizabeth's caregiver or maternal relatives. After six weeks of poor visits at the visitation center, the quality of visits improved during the last six weeks of the review period.

In October 2012, the court ordered that Elizabeth remain placed in out-of-home care while Kelly received an additional six months of reunification services. The court allowed limited unsupervised visits, but only if Kelly was in compliance with every portion of her case plan.

### 12-Month Review

The Agency's 12-month review report recommended the court terminate reunification services and order another permanent planned living arrangement (APPLA) as Elizabeth's permanent plan. Kelly had not consistently participated in her reunification services. She had been having unsupervised visits with Elizabeth in public places, like community parks, once per week. She also had been having two supervised visits per week at a family visitation center. Elizabeth enjoyed the visits, but sometimes they ended poorly due to arguments, which were typically about Kelly " 'nagging' Elizabeth about

things such as drinking enough water,[4] wearing her glasses, Elizabeth's interactions with boys, grades and 'having to respect' [Kelly]." The visitation center canceled its services because of excessive cancellations and no-shows by Kelly, at which point K.U., a maternal aunt, began supervising the visits. K.U. reported the visits generally go well, but "about once a month they have a bad visit where they argue or a visit is ended early."

Kelly was also involved in several incidents at Elizabeth's school. On two occasions, Kelly was so disruptive that the school's director issued 30-day stay-away orders. On a third occasion, someone called police after Kelly grabbed Elizabeth's arm in an attempt to have a private conversation during a supervised visit.

Elizabeth began to feel less comfortable in her caregiver's home and requested that she be placed with K.U.

At the 12-month review hearing in May 2013, the court ordered Elizabeth placed with K.U. and set a postpermanency review hearing for October 2013.

*October 2013 Postpermanency Review*

The Agency recommended Elizabeth remain placed with K.U. under APPLA. Elizabeth liked living with her aunt and felt comfortable in her home. Elizabeth was very proud of her improved academic performance. K.U. observed that Elizabeth's behavior gradually improved during the review period, except for one episode. One weekend in August, Elizabeth was away without leave (AWOL). She explained she had stopped taking a medication and felt angry, so she "decided to take off." When she returned

---

4    Doctors removed Elizabeth's left kidney at age one due to a tumor.

home, she appeared extremely agitated and stated she felt like hurting her dog and various people in the home. A confidential source reported to the Agency that Elizabeth had experimented with illicit drugs while AWOL.[5] Elizabeth agreed to enter Project Oz, a two-week therapy program that helps teenagers learn to communicate and deal with their feelings. Elizabeth completed the program and found it beneficial. She continued to participate in therapy to help address her anger, her placement in out-of-home care, and her grief over the death of her brother.

Meanwhile, Kelly was asked to leave her apartment. The added stressor of housing may have destabilized her mental health—she made statements of wanting to harm herself and reported she had attempted suicide. She continued to participate in weekly counseling to address symptoms of depression, posttraumatic stress disorder, anxiety, agoraphobia, and the death of her son.

Kelly continued to have supervised visits. Elizabeth loved Kelly very much, but also felt frequent contact with her was a source of frustration. Elizabeth did not want to visit Kelly without supervision due to fear for her safety and concern that Kelly's behavior might escalate during unsupervised contact.

The court confirmed APPLA as the most appropriate permanent plan and set another review hearing for June 2014.

---

[5]  While AWOL, Elizabeth reportedly stayed with her boyfriend, who was on probation for his own involvement with drugs.

The Agency recommended APPLA continue as Elizabeth's placement. She was happy in the placement and her mood appeared to have stabilized under a new medication prescribed by her psychiatrist. She was doing well in school and planning to attend college.

Kelly, on the other hand, struggled with her mental health and had missed several therapy appointments. She contacted Elizabeth's psychiatrist and told staff they could not speak to anyone but Kelly about Elizabeth's condition, which interfered with K.U.'s ability to care for Elizabeth. Kelly also stated she had diagnosed Elizabeth with bipolar disorder, even though Kelly's observations were not realized by anyone else and were likely a result of Kelly's own mental health issues. Kelly demanded Elizabeth's school make certain accommodations for Elizabeth, even though her academic performance demonstrated she did not require them.

One day in mid-May, as Kelly was on her way to K.U.'s house to visit Elizabeth, K.U. had to rush her mother to the hospital, leaving Elizabeth under the supervision of K.U.'s adult son, R.U. R.U. later left to visit his critically ill grandmother at the hospital, temporarily leaving Kelly and Elizabeth unsupervised. An altercation erupted during which Kelly put Elizabeth in a headlock, slapped her face, and tried to kick her. Elizabeth called K.U. for help. K.U. called a neighbor, who got Elizabeth and took her to the hospital to see her grandmother.

On June 2, Kelly went to Elizabeth's school and requested certain records. When she was told the records were unavailable because the registrar was absent, Kelly became

8

belligerent, directed profanity at school staff, and yelled loudly enough that students could hear her. School staff asked Kelly to leave, but she refused, telling staff they were "in contempt and that they would be judged." Kelly eventually left after school staff ordered her to do so. But she returned, found Elizabeth during her lunch break, and yelled false accusations about bad grades and truancy in front of approximately 300 students. The school's director took Elizabeth to her office to " 'protect her from her mother.' " Kelly followed them. She again became belligerent and told the director she will be " 'judged' " and was " 'in contempt.' " The director was afraid of Kelly and called 911. Kelly quietly left when she saw the police approaching. The director issued Kelly a two-week stay-away order.

Based on the May altercation and the June school disturbance, Elizabeth, through her counsel, requested a restraining order against Kelly. The court issued a temporary restraining order prohibiting Kelly from coming within 100 feet of Elizabeth's school or K.U.'s home or going near K.U.'s car. The court indicated it would consider making the order permanent at the contested postpermanency review hearing, which was continued to August 14, 2014.

*The Contested Hearing*

On the day of the contested hearing, Kelly and Elizabeth got into an argument in the courthouse lobby. Elizabeth was trying to say something to Kelly, but Kelly would not let her finish. Elizabeth left the courthouse briefly, but returned in time for the hearing. Because of the argument, however, Elizabeth requested the restraining order, if issued, prohibit *all contact* between her and Kelly.

9

The court received stipulated testimony of Elizabeth, Kelly, and two family friends, and received live testimony from K.U. and an Agency social worker. The court also received a letter from Elizabeth in which she wrote "I WANT A SENIOR YEAR!"

Kelly was disruptive during the hearing. During the social worker's testimony, Kelly left the courtroom. During K.U.'s testimony, Kelly waved her arms and made outbursts. The court warned Kelly she may be removed if she did not control her behavior. K.U. testified she had concerns for Elizabeth's mental and emotional well-being during visits with Kelly: "when it gets bad it just gets really, really bad." K.U. thought supervised visits could continue, but on Elizabeth's timetable and after a break. At that point, Kelly blurted "You're a bitch. You're not right. You didn't even raise your son. You're not right." The court instructed Kelly to leave the courtroom; she complied.

At the conclusion of the hearing, the court issued a restraining order directing that Kelly not contact Elizabeth and remain at least 100 yards away from her home and school for three years. The court found visitation would be detrimental to Elizabeth. The court invited counsel to seek modification of the restraining order if circumstances changed.

Kelly timely appealed the restraining order.

*The Order Modifying the Restraining Order*

Kelly subsequently petitioned the court under section 388 for an order modifying the restraining order to allow contact at four specified events in November and December

10

2014.[6]  Based on the parties' stipulation, the court modified the restraining order as requested.

## DISCUSSION

Kelly contends the juvenile court erred by issuing a restraining order that terminated all contact between her and Elizabeth for three years.  The Agency contends Kelly's appeal is moot because the juvenile court modified the restraining order to allow the contacts discussed above.  Alternatively, the Agency contends substantial evidence supports the court's findings that underlie the restraining order.

## I.

### *THE APPEAL IS NOT MOOT*

"It is not uncommon for an appellate court to take judicial notice of subsequent proceedings in the juvenile court and find the appeal has been rendered moot."  (*In re Karen G.* (2004) 121 Cal.App.4th 1384, 1390; *In re Jessica K.* (2000) 79 Cal.App.4th 1313, 1315 ["When no effective relief can be granted, an appeal is moot and will be dismissed."].)  The Agency has requested that we do so here.  Although we have granted the Agency's motion requesting that we take judicial notice of the order modifying the restraining order, we decline to dismiss the appeal as moot.

The restraining order prohibits any contact between Kelly and Elizabeth from August 2014 until August 2017.  The modification order allowed only limited contact on

---

6    The events were as follows: (1) attending Elizabeth's last volleyball game on her birthday (in November) and going to dinner with her afterward; (2) attending Thanksgiving dinner at K.U.'s house; (3) having lunch with K.U. and Elizabeth on Kelly's birthday (in December); and (4) attending Christmas brunch at K.U.'s house.

four specified occasions, all of which occurred in November and December 2014. Although contact on those occasions was likely emotionally material to Kelly and Elizabeth, we conclude they are legally immaterial in determining whether we can grant effective relief with respect to the remainder of the restraining order's three-year term. Accordingly, we deny the Agency's request to dismiss the appeal as moot.

II.

*THE JUVENILE COURT DID NOT ERR IN ISSUING THE RESTRAINING ORDER*

Once a juvenile dependency petition has been filed, section 213.5, subdivision (a), permits the juvenile court to issue an order "enjoining any person from molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, harassing, telephoning . . . , contacting . . . , coming within a specified distance of, or disturbing the peace of the child . . . and . . . excluding any person from the dwelling of the person who has care, custody, and control of the child."  In reviewing the restraining order, "we view the evidence in a light most favorable to the respondent, and indulge all legitimate and reasonable inferences to uphold the juvenile court's determination.  If there is substantial evidence supporting the order, the court's issuance of the restraining order may not be disturbed."  (*In re Cassandra B.* (2004) 125 Cal.App.4th 199, 210-211.)  "[E]vidence that the restrained person has previously molested, attacked, struck, sexually assaulted, stalked, or battered the child is certainly sufficient."  (*In re B.S.* (2009) 172 Cal.App.4th 183, 193.)

The record establishes Kelly physically abused Elizabeth on at least two occasions, first by throwing a candle that hit Elizabeth in the head; then by putting

12

Elizabeth in a headlock, slapping her, and trying to kick her. This alone constitutes substantial evidence sufficient to justify the restraining order. (*In re B.S.*, *supra*, 172 Cal.App.4th at p. 193; *In re C.Q.* (2013) 219 Cal.App.4th 355, 363 [§ 213.5 does not require "evidence of a reasonable apprehension of future abuse"].)

The record further establishes Kelly's disruptive behavior constitutes " 'molest[ation]' " that may be enjoined under section 213.5. (*In re Cassandra B.*, *supra*, 125 Cal.App.4th at p. 211.) " '[M]olesting' " need not be sexual; it may include activity that is troubling, disturbing, annoying or vexing. (*Id.* at p. 212.) In *In re Cassandra B.*, the Court of Appeal found "ample evidence" the mother was " 'molesting' " or "annoying" her nine-year-old daughter by "attempting to gain entry to the home of Cassandra's caregivers without their knowledge, appearing at Cassandra's school and then following behind the caregiver's car after Cassandra was picked up from school, together with her threats to remove Cassandra from her caregivers' home . . . ." (*Id.* at pp. 212-213.)

Similarly, in *In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1512, the Court of Appeal affirmed a permanent injunction where substantial evidence established that the children's grandmother, who was seeking custody of them, "concealed herself at a scheduled visitation between the minors and their birth mother so as to obtain unauthorized access to them; surreptitiously searched out and located the confidential location of the foster residence, in violation of their intended privacy; hired a private detective to spy on the minors' comings and goings at their foster home; and showed up unannounced at each of the minors' schools, where she proceeded to make defamatory

13

accusations about the foster parents to school authorities and attempted to make unauthorized contact with the minors."

Elizabeth's school director issued three stay-away orders because of Kelly's disruptive, belligerent, and aggressive behavior. School officials called police three times because of Kelly's behavior. Kelly humiliated Elizabeth in front of 300 schoolmates and caused a scene at church. Kelly acknowledges in her briefing on appeal that "she cannot always keep her responses within appropriate boundaries." On this record, the juvenile court's issuance of the restraining order was supported by substantial evidence.

Kelly contends the restraining order is too broad because it terminates all contact and visitation. As this court has noted, "[v]isitation between a dependent child and his or her parents is an essential component of a reunification plan, even if actual physical custody is not the outcome of the proceedings. [Citation.] . . . However, '[n]o visitation order shall jeopardize the safety of the child.' (§ 362.1, subd. (a)(1)(B).) It is ordinarily improper to deny visitation absent a showing of detriment." (*In re Mark L.* (2001) 94 Cal.App.4th 573, 580 (*Mark L.*).) The substantial evidence standard of review applies to a determination that visitation would be detrimental to the child. (*Id.* at p. 581, fn. 5.)

The juvenile court found "specifically that visitation, based on the evidence before the court, would be detrimental" to Elizabeth. Addressing Elizabeth, the court explained its reasoning at length: "I don't view you as emotional to the extent that you are going to change your mind or don't know what you're doing or that this is a rash act. [¶] We have been talking about visitation with your mother for months and months and months. You have bent over backwards to be accommodating, as your aunt said. [¶] You've spent your

14

life trying to compromise. It is a painful reality. And I can say this at this point, since your mom is not present in the courtroom, to have to come to terms, to accept the fact that your mom is mentally ill. And that's something that I know you know. [¶] I'm not telling you anything you don't know. But it's very difficult to have to deal with, and you have been impressive in terms of your willingness to try and meet her more than halfway. [¶] You've really worked at it, and we've had all sorts of permutations as to visitation in here. We've tried it and tried it, and we really have not been able to be successful at it. [¶] And I think that not only do you deserve a senior year that is a good senior year, both academically and emotionally, but in addition you deserve time to not have this stressor put upon you. [¶] You've got enough going on with school and having to try to do well this year, thinking about college. We need to give you relief from this ongoing kind of problem in terms of dealing with the visitation and the family dynamics that get triggered by it. [¶] Your aunt's in a tough position, you're in a tough position, the rest of the family gets mobilized, and I think it's not in your best interest."

In light of Elizabeth's own struggles with mental health issues, her fear of her mother's instability, and her desire to enjoy her senior year of high school and focus on college preparation, we conclude the same evidence that supports the issuance of the restraining order in the first instance similarly constitutes substantial evidence that continued visitation would be detrimental to Elizabeth. Courts have found substantial evidence of detriment under similar circumstances. For example, in *Mark L.*, this court affirmed the juvenile court's finding of detriment where the 16-year-old dependent testified he did not want to visit his father because he was still afraid of him (the father

15

had physically abused the son when he was five and six years old).  (*Mark L.*, *supra*, 94 Cal.App.4th at pp. 579, 581.)  In *In re Danielle W.* (1989) 207 Cal.App.3d 1227, the Court of Appeal affirmed the juvenile court's order providing for no visitation with the mother until the children wanted it, where substantial evidence established the children were angry with the mother because she failed to protect them against sexual abuse by the stepfather.  (*Id.* at p. 1238.)  The court found detriment even though the mother had since separated from the abuser, who no longer posed a threat to the children.  (*Id.* at pp. 1238-1239 ["The order does not constitute punishment of the parent but rather protection of the minor's psychological well-being."].)

"The focus of dependency law is on the well-being of the child, and we do not fault the court for determining forced contact with [Kelly] may harm [Elizabeth] emotionally."  (*Mark L.*, *supra*, 94 Cal.App.4th at p. 581.)  Further, we commend the juvenile court for inviting the parties to seek a modification of the order if circumstances change, as has already happened once.

DISPOSITION

The order is affirmed.


IRION, J.

WE CONCUR:


HALLER, Acting P. J.


McDONALD, J.

16